DONALD W. CROWELL AND SUZANNE C. CROWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Crowell v. Commissioner
Docket No. 2659-82.
United States Tax Court
T.C. Memo 1986-314; 1986 Tax Ct. Memo LEXIS 288; 51 T.C.M. (CCH) 1556; T.C.M. (RIA) 86314; July 28, 1986. William R. Nicholas and Boyd J. Black, for the petitioners. Charles W. Jeglikowski and David P. Fuller, for the respondent. CLAPP
MEMORANDUM OPINION CLAPP, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the year 1973 in the amount of $28,268.19. The sole issue for decision is whether petitioners are entitled to a theft loss deduction under section 165(c)(3)[1] with respect to their investment in the stock of Equity Funding Corporation of America (EFCA). This case was submitted fully stipulated. The *289 stipulation of facts and attached exhibits are incorporated herein by this reference. The pertinent facts are summarized below. Petitioners, Donald W. Crowell and Suzanne C. Crowell, husband and wife, resided in San Marino, California, at the time the petition was filed in this case. Since at least 1970, petitioner, Donald Crowell (hereinafter petitioner in the singular) has been a stockbroker with and the managing partner of Crowell, Weedon & Co., a regional securities brokerage and investment firm. In 1970 and 1971, petitioner purchased shares of the outstanding common stock of EFCA on the open market as follows: Cost (including
Settlement
Price Per
Number of
commissions and
Trade Date
Date
Share
Shares
service charges)
10/9/70
10/19/70
$26.50 500
$13,411.25
10/9/70
10/19/70
26.125
500
13,237.80
10/16/70
10/23/70
24.625
300
7,496.43
10/19/70
10/26/70
24.375
200
4,952.38
11/10/71
11/17/71
33.50 500
16,943.75
Totals
2,000
$56,041.61
EFCA was formed in 1961. Its principal product was the sale of life insurance coupled with shares of mutual funds. The package was marketed as a planned investment *290 and insurance program which emphasized equity investments with growth potential while providing insurance protection. Participants utilized their mutual fund shares as collateral to finance their insurance premiums. The insurance sold by EFCA was primarily written by Equity Funding Life Insurance Company (EF Life), an Illinois-chartered subsidiary of EFCA. EFCA owned several other subsidiaries involved in the sale of insurance. EFCA was a holding company with diverse interests in insurance, securities, banking, cattle, real estate development, oil and gas and foreign investments. EFCA made its first public offering of stock in 1964.Its annual audited financial statements then and thereafter became a matter of public record in prospectuses, in registration statements and reports filed with the Securities and Exchange Commission (SEC) and in reports to shareholders. In its public certified financial statements, EFCA reported steady growth from 1964 through 1972 in gross income, net earnings, stockholders' equity and earnings per share. Rumors regarding EFCA spread on Wall Street after March 6, 1973 and EFCA's stock became a volume leader on the New York Stock Exchange (NYSE). *291 Its price declined steadily. On January 3, 1973, EFCA stock had traded at a 1973 high of $36.875 per share. On March 27, 1973, the NYSE, at 12:45 p.m. Eastern Standard Time, suspended trading in EFCA stock. The stock was then trading at $14.375. On March 28, 1973, the SEC ordered a suspension in trading of all EFCA securities on all exchanges. On March 30, 1973, the California Department of Insurance seized EF Life. On April 2, 1973, the California Department of Insurance filed an application in the Superior Court of the State of California for the County of Los Angeles seeking to place EF Life in conservatorship stating, among other grounds, that EF Life had been reporting to its reinsurers fictitious life insurance policies in violation of section 484 of the California Penal Code. The application was granted by the Superior Court. On April 3, 1973, the SEC filed a complaint in the United States District Court for the Central District of California alleging violations of the Federal securities law by EFCA and its officers. Among other allegations, the SEC asserted that EFCA, acting by and through its officers and employees, had employed a scheme to defraud investors, engaged *292 in acts and practices which operated as a fraud and deceit upon such investors, and had made untrue statements of material facts or omitted material facts in connection with the purchase and sale of EFCA's securities and those of some of its subsidiaries and affiliates. EFCA consented to the entry of a permanent injunction against it. On April 5, 1973, EFCA filed a petition for protection under Chapter X of the Federal bankruptcy laws in the United States District Court for the Central District of California. With the disclosure of problems at EFCA and its subsequent petition for bankruptcy, beginning as early as April 6, 1973, major brokerage houses in the United States sent out margin calls to investors who held Equity Funding stock in margin accounts. On April 10, 1973, a trustee was appointed in the EFCA bankruptcy proceeding. On March 8, 1974, the trustee issued a report to EFCA's creditors and stockholders summarizing the fraudulent practices of EFCA. The trustee categorized the activities into three types: "creation and inflation of assets in the balance sheet; failure to record liabilities for borrowed cash; and the creation of bogus insurance, most of which was coinsured *293 with other insurance companies." On October 31, 1974, the trustee filed a lengthy report in the EFCA bankruptcy case which detailed the history of the EFCA fraud. The trustee concluded that the fraud scheme was motivated by a desire on the part of the participants to inflate the market price of EFCA's stock. The originators of the conspiracy were also major holders of EFCA's stock. In the trustee's opinion, the fraud was principally carried out by inflating the company's reported earnings, largely by recording bogus income. On November 1, 1973, a Federal grand jury in Los Angeles, California, handed down an indictment with 105 counts including securities fraud, mail fraud and filing false documents with the SEC, against the principal officers of EFCA. On November 30, 1973, one of the officers pled guilty under a plea bargaining arrangement. Indictments were also returned by Illinois and New Jersey grand juries. All of the principal officers either pleaded guilty or were found guilty of some of the charges. On December 8, 1975, the Federal bankruptcy court approved the trustee's plan of reorganization for EFCA. As shareholders in EFCA, the Crowells were included in the class *294 of EFCA creditors entitled "Creditors Class 8 -- Fraud Claimants." Pursuant to the trustee's plan of reorganization approved by the bankruptcy court, Orion Capital Corporation (Orion) succeeded to certain assets of EFCA. On October 12, 1976, Orion stock certificates were distributed to claimants in the EFCA bankruptcy proceeding. The Crowells received 561 shares of Orion. Trading in Orion stock was first quoted in the over-the-counter market on October 18, 1976 at $4.375 bid. On their 1973 income tax return, petitioners claimed a casualty or theft loss of $55,942 ($56,042, basis in EFCA stock, minus $100). In his notice of deficiency dated November 30, 1981, respondent disallowed the loss. Petitioners contend that the loss sustained in regard to their EFCA shares constituted a theft and therefore is deductible under section 165(c)(3). This issue has already been resolved in respondent's favor in DeFusco v. Commissioner,T.C. Memo. 1979-230. In that case, relying on Barry v. Commissioner,T.C. Memo. 1978-215, we held that the taxpayer was not a victim of theft under California law with respect to his purchases of EFCA's stock on the open *295 market. The fatal flaw in taxpayer's case was the lack of privity between the alleged defrauder and the taxpayer. Petitioners contend that DeFusco does not constitute an accurate statement of applicable California criminal law. Petitioners argue that under section 484 of the California Penal Code the perpetrator making the false representation need not personally receive the benefit of his fraud. However, this Court specifically stated: We also note that under California law it is unnecessary to prove that the defrauder benefitted personally from the fraudulent acquisition. People v. Ashley, 42 Cal. 2d 246 P.2d 271 (1954); People v. Jones,36 Cal. 2d 373, 224 P.2d 353 (1950). But those cases also underscore that there must at least be an appropriation by the defrauder of the victim's property -- an essential element of theft which is lacking in the instant case. [38 T.C.M. 920, 922; 48 P-H Memo T.C. par. 79,231 at 878-79.] Although the alleged defrauder does not need to obtain the property for himself, an essential *296 element of the crime of theft by false pretenses is the intent to defraud the owner of his property. People v. Fujita,43 Cal. App. 3d 454, 117 Cal. Rptr. 757 (1974), cert. denied 421 U.S. 964 (1975). Implicit in this element and present in all of the cases decided by California courts relied on by petitioners is a relationship of privity between the perpetrator and his victim. Here, however, petitioner purchased the stock on the open market. There is no evidence that the officers of the corporation in making fraudulent misrepresentations did so with the specific intent of depriving petitioners of their money. See Paine v. Commissioner,63 T.C. 736, 741-742 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). Petitioners also argue that they suffered a theft loss under Federal criminal law. It is well settled, however, that the law of the State where the loss was sustained determines whether or not a theft has occurred. Paine v. Commissioner,supra at 740. We can find no basis *297 for distinguishing this case from DeFusco v. Commissioner. Accordingly, we hold that respondent's determination must be sustained. [2]
Decision will be entered for the respondent.
Footnotes
1. All references to sections are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.↩
2. In the alternative, respondent argues that even if there were a qualified theft loss, it is not allowable in 1973 because a reasonable prospect of recovery existed in that year. The opinion in DeFusco↩ is dispositive of this issue in respondent's favor as well.