# United States Tax Court

T.C. Memo. 2024-43

CHRISTOPHER S. PASCUCCI AND SILVANA B. PASCUCCI,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 2966-19.                              Filed April 15, 2024.

————

On Schedule A, "Itemized Deductions", of their 2008 tax return, Ps claimed an I.R.C. § 165 theft loss deduction of $8.2 million and a resulting net operating loss ("NOL"); and for tax years 2005, 2006, and 2007, Ps claimed tentative refunds for carrybacks of the 2008 NOL. The claimed theft loss resulted from the decline in cash value of separate accounts for Ps' variable life insurance policies held with two insurance companies. The decline occurred after the unraveling of a Ponzi scheme perpetrated by Bernard L. Madoff in 2008. R disallowed the theft loss deduction and the NOL carrybacks, and R accordingly determined deficiencies for 2005, 2006, and 2008.

*Held*: Ps did not own the assets in the separate accounts at the time of the theft by Mr. Madoff.

*Held, further*, Ps are not entitled to a theft loss deduction under I.R.C. § 165 nor to the NOL carrybacks.

————

*Kendall C. Jones* and *Mary E. Monahan*, for petitioners.

*Deborah Aloof*, *Rachel L. Gregory*, and *Nathaniel C. Smith*, for respondent.

————

**Served 04/15/24**

[*2]                    MEMORANDUM OPINION

GUSTAFSON, *Judge*:   This is an income tax deficiency case brought pursuant to section 6213(a),[1] in which petitioners, Christopher S. and Silvana B. Pascucci,[2] challenge the determination by the Internal Revenue Service ("IRS") to disallow the Pascuccis' claimed theft loss deduction for the 2008 tax year (and the resulting loss carrybacks that they claimed for tax years 2005 and 2006).   By joint motion of the parties, this case was submitted fully stipulated under Rule 122.   The facts stated below are based on the pleadings, the stipulations, and exhibits to which the stipulations are attached.   For the reasons stated below, we hold that the IRS properly disallowed the claimed theft loss deduction because the Pascuccis did not own the assets that were stolen in 2008 as part of the Ponzi scheme carried out by Bernard Madoff.

*Background*

When the Pascuccis timely filed the petition commencing this case, they resided in New York.

*The variable life insurance policies*

Mr. Pascucci owned, either directly or through trusts, 16 flexible premium variable life insurance policies ("Policies") on December 11, 2008.   Seven of the Policies—which Mr. Pascucci had owned since 1997—were with Security Equity Life Insurance Co. ("SELIC"), and the other nine—owned by Mr. Pascucci since 2001—were with General American Life Insurance Co. ("GenAm").   Both GenAm and SELIC were acquired by Metropolitan Life Insurance Co. ("MetLife") before the 2008 collapse of the Madoff Ponzi scheme (described below).

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. ("Code"), as in effect at the relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), as in effect at the relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. A citation of a "Doc." in this Opinion refers to a document as numbered in the Tax Court docket record of this case.   Dollar amounts are rounded.

[2] Mr. and Mrs. Pascucci filed joint tax returns for the years at issue; the notice of deficiency underlying this case was issued to both of them; and both are petitioners here.   However, it was Mr. Pascucci who engaged in the transaction at issue here, so this opinion refers primarily to him.

**[*3]** *The SELIC Policies*

On or around April 22, 1997, SELIC issued a private placement memorandum ("SELIC PPM")[3] that offered recipients the option to purchase a variable life insurance certificate that would provide them the opportunity to acquire insurance on the life of a person in whom they had an insurable interest. Premiums paid would be held in one or more separate accounts. The first page of the memorandum stated: "The assets of each Separate Account are owned by SELIC but are kept separate from the assets in SELIC's general accounts and any of its other separate accounts." To the same effect, a section of the memorandum entitled "The Separate Accounts" provided: "For State law purposes, each Separate Account is treated as a part or division of SELIC. . . . SELIC owns the assets of each Separate Account."

The Insurance Account Value under the Certificate varied (unlike a conventional life insurance policy, which has a predictable cash value and a fixed death benefit), and the Certificate Holder bore the entire investment risk. The Certificate included no minimum guaranteed Investment Account Value for the premiums paid.

MetLife acquired SELIC in 1999. After that acquisition, Mr. Pascucci received an amendment to the SELIC PPM, which stated, as in the SELIC PPMs, that it continued to be true that "the Company [now MetLife] is the legal owner of the assets in all the Separate Accounts".

*The GenAm Policies*

On February 28, 2001, GenAm (already owned by MetLife) issued five private placement memoranda ("GenAm PPMs") that offered flexible premium variable life insurance policies (referred to as "Contracts") to eligible purchasers (referred to as "Contract Holders").[4]

---

[3] On its cover page the SELIC PPM was entitled "A Private Placement Offering for Large Case Life I Group Certificate of Insurance with a Limited Partnership Separate Account / Clients of Tremont / A Group Flexible Premium Life Insurance Product Offered by the Security Equity Life Insurance Company".

[4] The parties ostensibly stipulated that MetLife acquired GenAm in 2003, *see* Doc. 44, para. 102, but each of the GenAm PPMs states: "On January 6, 2000 The Metropolitan Life Insurance Company of New York ('MetLife') acquired GenAmerican Corporation. As a result of that transaction, General American became an indirect, wholly-owned subsidiary of MetLife." *See, e.g.*, Ex. 18-P, at 14 (Doc. 46 at PASC_001262).

[*4] The Net Cash Value of the Contracts would vary over time with the investment performance of the Investment Portfolios of the Separate Accounts into which the Net Premiums were invested. Each of the GenAm PPMs explains that "[t]he Company [i.e., GenAm] owns the assets of the Separate Accounts",[5] but that the separate accounts were segregated from GenAm's general account and any other separate accounts. Further, there was no guarantee by GenAm as to the Net Cash Value, and each Contract Holder bore the entire investment risk. Contract Holders were able to allocate the premiums paid to or among various Investment Portfolios contained in the Separate Accounts.

*Madoff/BLMIS*

Bernard Madoff founded Bernard L. Madoff Investment Securities ("BLMIS") in 1959 as a sole proprietorship before forming it as a limited liability company in January 2001. BLMIS claimed to provide investors a secure investment with a high rate of return using a "split strike conversion" strategy. Mr. Madoff received billions of dollars from approximately 4,800 client accounts and, as he eventually admitted, used the funds to operate the Madoff Ponzi scheme through BLMIS. As he later explained (in his allocution):

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false for many years. Up until I was arrested on December 11, 2008, I never invested these funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

---

[5] Appendix C to the GenAm PPMs reaffirms that "the assets of the Separate Accounts are the property of General American". *See, e.g.*, Ex. 18-P, at C-1 (Doc. 46 at PASC_001297).

**[*5]** On December 11, 2008, Mr. Madoff was arrested for—and ultimately pleaded guilty to—securities fraud, investment adviser fraud, mail fraud, wire fraud, money laundering, false statements, perjury, false filings with the Securities and Exchange Commission, and theft from an employee benefit plan. On June 29, 2009, he was sentenced to 150 years in prison. It was later determined that the number of identifiable victims of Mr. Madoff's crimes made restitution impracticable and that attempts to determine complex issues relating to the causes or amounts of losses would complicate or prolong the sentencing process. Therefore, the U.S. District Court for the Southern District of New York authorized the Federal Government to proceed under forfeiture statutes. *See* 21 U.S.C. § 853(i). Mr. Madoff died in prison in 2021.

*The Tremont Opportunity Fund*

The investment of Mr. Pascucci's life insurance premiums into the Madoff Ponzi scheme began in 2001 with an entity eventually called the Tremont Opportunity Fund III, LP ("Tremont").[6] (As we set out in greater detail below, Mr. Pascucci paid premiums into the insurance companies' separate accounts, which invested them in Tremont, which invested a portion of them in an entity called Rye Broad Market Series ("Rye Broad"), which invested that portion in BLMIS, from which Mr. Madoff committed his theft.)

In January 2001 Tremont offered to insurance companies via a Confidential Private Placement Memorandum the opportunity to invest in it by acquiring limited partnership interests. Insurance companies could acquire partnership interests in Tremont with the funds in separate accounts of individuals who held variable life insurance and variable annuity contracts. Individuals could allocate their premiums to the separate account which invested in Tremont. The insurance company would then have a limited partnership interest in Tremont and would have no right to manage or control the partnership and would not have any right to manage or control investment decisions or selection of

---

[6] In 2001 Tremont was called "the American Masters Opportunity Insurance Fund, L.P." ("AMOIF"), which had been organized as a Delaware limited partnership on December 18, 2000; and Tremont Partners, Inc. ("Tremont Partners"), was the general partner of AMOIF. Tremont Partners was a wholly owned subsidiary of Tremont Advisors, Inc. AMOIF was renamed "the Tremont Opportunity Insurance Fund, L.P." and was subsequently renamed "the Tremont Opportunity Fund III, L.P."

[*6] fund managers. Tremont's general partner had sole discretion in choosing Tremont's investment managers.

GenAm and SELIC determined to offer to their policy holders an option of investing in Tremont. Appendices to the GenAm PPMs issued in February 2001 stated that an investor could allocate premiums to "Separate Account Forty-Nine", by which the funds would be invested in Tremont. *See, e.g.*, Ex. 18-P, at C-2. Similarly, MetLife's December 2003 amendment (Ex. 17-P) to the SELIC PPM authorized an investor to allocate premiums to "Separate Account Seventy-Four", by which the funds would be invested in Tremont.

Mr. Pascucci opted to allocate his premiums to the separate accounts with which GenAm and SELIC invested in Tremont. Petitioners acknowledge that they did not choose and could not replace Tremont's investment managers, that they did not have and did not exercise any control over Tremont's investments, and that they did not and could not compel Tremont to make any particular investment.

*Tremont to Rye Broad to BLMIS*

Mr. Pascucci's investment of life insurance premiums into Madoff's BLMIS was made indirectly: He invested directly into GenAm's Separate Account 49 and SELIC's Separate Account 74. GenAm and SELIC invested in Tremont. As of November 2008, Tremont had approximately 21.64% of its assets invested in Rye Broad,[7] which were "feeder funds" that invested nearly all of their funds with BLMIS. It was from BLMIS that Mr. Madoff committed theft.

After the collapse of the Madoff Ponzi scheme, Rye Broad informed its clients that their investments with it were worthless. Consequently, the value of Tremont's assets decreased by approximately 21.64%, and the values of the GenAm and SELIC separate funds were concomitantly reduced. That is, Mr. Madoff's theft from BLMIS rendered Rye Broad worthless, reducing the values of the separate accounts and thus making Mr. Pascucci's life insurance policies worth much less. The Commissioner admits: "[T]he cash values of the Policies

---

[7] The parties' stipulation states that in January 2009 Tremont Partners (the general partner of AMOIF/Tremont, *see supra* note 6) was "General Partner for the [Rye] Funds". As far as we know, the record in this case does not provide further detail about the relationship of Tremont to Rye Broad nor about when Tremont Partners became "General Partner for the [Rye] Funds".

[*7] did decline as a result of the collapse of Madoff's Ponzi scheme and the theft of Rye Broad Market Series' assets."

However, even after the Madoff Ponzi scheme unraveled, Mr. Pascucci still owned the insurance policies; GenAm and SELIC still owned (and held in the separate accounts) the limited partnership interests in Tremont; Tremont still owned the shares in Rye Broad; and Rye Broad still owned its shares in BLMIS—though the BLMIS shares and the Rye Broad shares were worthless.

*Direct investment through CSP*

No longer in dispute in this case are other Madoff losses that the Pascuccis suffered. Their family partnership, CSP Investment Associates LLC ("CSP"), had directly invested $9.1 million in BLMIS and lost that entire amount. (The IRS does not dispute the Pascuccis' tax treatment of that loss, as described below.)

*The Madoff Victim Fund*

Sadly, Mr. Pascucci was one of a large group of victims. The Madoff Victim Fund ("MVF") was established by the Department of Justice ("DOJ") to distribute more than $4 billion in assets forfeited from BLMIS and related persons to individuals who invested in, and suffered a loss resulting from the collapse of, BLMIS. Eligibility requirements for relief through the MVF were relatively simple: If an individual had his own money invested in BLMIS and suffered an actual loss when the fraud was exposed, then he could seek recovery. The MVF program was "unique" in that it focused not on the feeder funds invested in BLMIS but on the "ultimate investor". Mr. Pascucci applied for relief through the MVF in February 2014 and was approved for an eligible loss amount of $202,766 on February 27, 2018.

*The Pascuccis' Forms 1040 and 1045*

The Pascuccis timely filed their Form 1040, "U.S. Individual Income Tax Return", in October 2009. On that return they claimed Madoff-related losses totaling $17.3 million, consisting of $9.1 million of other miscellaneous deductions for the CSP losses and $8.2 million of theft losses derived from the variable life insurance policies. As a result, they reported for 2008 a net operating loss ("NOL") and zero income tax liability and claimed an overpayment.

**[\*8]** To carry that NOL back to tax years 2005, 2006, and 2007, the Pascuccis filed on December 16, 2009, Form 1045, "Application for Tentative Refund", asserting an NOL of $17.5 million[8] in 2008 and claiming NOL carrybacks of $6.3 million for 2005, $9.2 million for 2006, and $2 million for 2007. Apparently the IRS allowed refunds for some or all of the years at issue.

*Notice of Deficiency*

On December 11, 2018, the Commissioner sent to the Pascuccis a Notice of Deficiency ("NOD") determining tax deficiencies of $1.7 million for 2005, $1.73 million for 2006, and about $320,000 for 2008. The NOD explained on Form 886–A, "Explanation of Adjustments", that the NOL deduction from the 2008 tax year was disallowed and that therefore the resulting NOL carrybacks for tax years 2005 and 2006 were also disallowed. Aside from miscellaneous deductions now conceded by the Commissioner, the NOD disallowed the Pascuccis' claimed casualty and theft loss deduction because they failed to establish that a casualty or theft occurred and that they sustained such a loss.

*Tax Court proceedings*

After concessions,[9] the only issue remaining before the Court is whether the Pascuccis are entitled to a theft loss deduction for the 2008 tax year (and to the related carrybacks). The parties agreed that no trial is necessary and that all the relevant facts could be stipulated under Rule 122.

---

[8] We do not attempt to resolve the discrepancy between the $17.3 million on Form 1040 and the $17.5 million on Form 1045. The parties can address the matter, if necessary, under Rule 155.

[9] The parties filed a Stipulation of Settled Issues on April 1, 2022, in which the Commissioner conceded the $9.1 million adjustment to Other Miscellaneous Deductions (for Madoff-related losses incurred by the Pascuccis' family partnership, discussed below), leaving only the issue of the theft loss deduction. The Commissioner further conceded that, if the Court determines that the Pascuccis are entitled to a casualty and theft loss deduction, they have met their burden of showing there was no reasonable prospect of recovery at the close of the 2008 tax year.

**[\*9]**                                        *Discussion*

I.      *General legal principles*

     A.      *Burden of proof*

A taxpayer generally bears the burden of proof when contesting the determinations in an NOD.  *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  That is, the burden to prove an entitlement to a deduction falls on the taxpayer.  *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 85 (1992). As we noted above, this case was submitted fully stipulated under Rule 122, but "[t]he fact of submission of a case, under paragraph (a) of this Rule, does not alter the burden of proof, or the requirements otherwise applicable with respect to adducing proof, or the effect of failure of proof."  Rule 122(b). The Pascuccis do not argue that the burden of proof has shifted pursuant to section 7491(a).

     B.      *Tax treatment of life insurance and annuities*

The Policies in this case are a form of private-placement variable life insurance.  Private-placement insurance is sold exclusively through a private-placement offering.  These policies are marketed chiefly to high-net-worth individuals who qualify as accredited investors under the Securities Act of 1933.  *See* 15 U.S.C. § 77b(a)(15) (2006); 17 C.F.R. § 230.501(a) (2006).

Variable life insurance is a form of cash value insurance.  Under traditional cash value insurance, the policyholder typically pays a level premium during life and the beneficiary receives a fixed death benefit. Under a variable policy, both the premiums and the death benefit may fluctuate.  The assets held for the benefit of the policy are placed in a "segregated asset account", that is, an account "segregated from the general asset accounts of the [insurance] company".  § 817(d)(1).[10]  The policy earns not a fixed or predictable rate of return but instead a return dictated by the actual performance of the investments in this separate account.

If the assets in the separate account perform well, the premiums required to keep the policy in force may be reduced as the account

---

[10] Segregated accounts must be adequately diversified as required by Treasury Regulation § 1.817-5(b)(1).  The Commissioner does not contend that the separate accounts at issue here failed the section 817(h) asset diversification requirements, and so we do not discuss them further.

[*10] buildup lessens the insurer's mortality risk. If those assets perform extremely well, as seemed to be the case with Mr. Pascucci's Policies before the Madoff Ponzi scheme unraveled, the value of the policy may substantially exceed the minimum death benefit. If that occurs, then upon the insured's death, the beneficiary receives the greater of the minimum death benefit or the value of the separate account. If instead the separate account performs poorly and the value of its assets falls, then the amount received by the beneficiary is limited to the minimum death benefit of the policy.

Life insurance and annuities enjoy favorable tax treatment. Under section 72, earnings that accrue to cash value and annuity policies—often referred to as the "inside buildup"—are not currently taxable to the policyholder (and in general are not taxable to the insurance company). The cash value of the policy thus grows more rapidly than the value of a taxable investment portfolio. The policyholder may access this value, often on a tax-free basis, by withdrawals and policy loans during the insured's lifetime. *See* § 72(e). If the contract is held until the insured's death, then the insurance proceeds (the death benefit) generally are excluded from the beneficiary's income under section 101(a). With proper structuring, the death benefit will also be excluded from the estate tax. *See* § 2042.

C. *The investor control doctrine*

While ownership of the assets in the separate accounts of a variable life insurance policy is assumed to belong to the insurance company, a policyholder will be considered the owner for tax purposes if his "incidents of ownership over those assets become sufficiently capacious and comprehensive". *Webber v. Commissioner*, 144 T.C. 324, 350 (2015). If, after all facts and circumstances are considered, the policyholder is determined to be the owner of the assets in the separate accounts, then the hoped-for tax benefit to be enjoyed by the policyholder on the inside buildup is lost, and the tax on the gain is not deferred. *Helvering v. Clifford*, 309 U.S. 331, 335–36 (1940); *Webber*, 144 T.C. at 360–61. This principle is referred to as the "investor control doctrine", and it is a particular application of the general, long-held principle that "tax liability attaches to ownership." *Blair v. Commissioner*, 300 U.S. 5, 12 (1937). While the Pascuccis initially affirm in their briefs that Mr. Pascucci lacked investor control over the assets in the separate accounts (an affirmation necessary to their avoiding taxation on the inside buildup), they later make the argument that Mr. Pascucci had sufficient "burdens and benefits" under the Policies to be considered an

**[*11]** owner of the assets in the separate accounts. However, to make this argument, they rely on the incidents of ownership whose existence or absence governs the application of the investor control doctrine. For that reason, we discuss here how the doctrine has been applied in the following previous cases.

In *Webber*, the owner of life insurance funded by separate accounts was held to have exercised "sufficiently capacious and comprehensive" control over the separate accounts of his life insurance policies because he directed the investment manager to "buy, sell, and exchange securities and other property", particularly in companies in which the taxpayer sat on the board and in which he invested his personal accounts, individual retirement accounts, and private-equity funds. *Webber*, 144 T.C. at 350, 364. Further, there was no evidence before the Court that the investment manager acted independently by researching the "suggestions" made by the taxpayer as to investment strategy and companies. *Id.* at 362. The taxpayer could, and did, extract cash "at will" from the separate accounts without resorting to policy loans. *Id.* at 366–67. Finally, the Court found that the taxpayer's ability to derive other benefits through his separate accounts, highlighting specifically the way the separate accounts' investments mirrored his own personal investments, made the separate accounts "a private investment account through which he actively managed a portion of his family's securities portfolio." *Id.* at 367. In coming to its decision, the Court cited relevant Revenue Rulings in which the IRS described the "investor control" doctrine and the standards through which the IRS would evaluate a taxpayer's control over separate accounts. *See id.* at 353–57.

Similarly, in *Corliss v. Bowers*, 281 U.S. 376 (1930), the taxpayer was liable for taxes on funds that were held in trust and were made payable to his wife, when he reserved the power to modify or revoke the trust at any time. The Court invoked the investor control doctrine and reasoned that "[t]he income that is subject to a man's unfettered command and that he is free to enjoy at his own opinion may be taxed to him as his income, whether he sees fit to enjoy it or not." *Id.* at 378.

To inform our interpretation of the Code, this Court may look not only to regulations and caselaw, but also to relevant Revenue Rulings with a "power to persuade". *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *Webber*, 144 T.C. at 353. Consequently, we consider Revenue Ruling 77-85, 1977-1 C.B. 12, 14, which noted that an "insurance company must be the owner of the assets in the segregated accounts" in

**[\*12]** order for a policy to qualify as a "variable contract" based on a "segregated asset account" within the meaning of section 817(d). In the scenario addressed by Revenue Ruling 77-85, 1977-1 C.B. at 14, the policyholder was held to be the owner of the assets even after depositing them with a custodian because he controlled all aspects of how the custodian invested the assets and even had the option to surrender the policy at any point before the annuity starting date (the date on which he would receive his first payment under the annuity). Therefore, the level of control the policyholder exercised was so similar to the level of control he would have had if the assets had still been in his direct possession, that he would "effectively enjoy[] the benefit of any income produced by, and any increase in the value of, the assets in the custodial account".[11] *Id.*

Revenue Ruling 81-225, 1981-2 C.B. 12, addressed four scenarios in which mutual fund shares, which were purchased with assets in separate accounts, were available publicly. In that instance, the insurance companies were "little more than a conduit between the policyholders and their mutual fund shares", and the investor was considered to have control. *Id.* at 14. However, if the shares were available only through the purchase of an annuity contract, then the investor would lack control and the insurance company would be the true owner of the assets. *Id.*

Not only must shares purchased with assets in a separate account not be available publicly, in order for the insurance company to be considered the owner of the shares, but also "control over individual investment decisions must not be in the hands of the policyholders." Rev. Rul. 82-54, 1982-1 C.B. 11, 12. However, without falling afoul of the investor control doctrine, a policyholder may have the right to change the allocation of his premiums among subaccounts at any time and to transfer funds among subaccounts, so long as the policyholder "cannot select or recommend particular investments", "cannot communicate directly or indirectly with any investment officer . . . regarding the selection . . . of any specific investment or group of investments", and so long as "[t]here is no arrangement, plan, contract, or agreement" between the policyholder and the insurance

---

[11] That the assets were held in a custodial account did not affect the ownership of the assets because "[t]he setting aside of the assets in the custodial account for the purchase of term annuities is basically a pledge arrangement", and property held in trust or escrow to satisfy legal obligations for an individual is deemed to be the property of said individual. Rev. Rul. 77-85, 1977-1 C.B. at 14–15.

**[\*13]** company or investment manager regarding "the investment strategy of any [s]ub-account, or the assets to be held by a particular sub-account." Rev. Rul. 2003-91, 2003-2 C.B. 347, 348.

As we explain below, Mr. Pascucci's Policies successfully dodged the hazards, and he was considered not to have investor control. But, as we will show, that lack of control fatally undermines his contention that he has an ownership interest sufficient to entitle him to deduct a theft loss.

### D.     *Theft loss deduction*

An individual may generally deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise." § 165(a). A loss of property neither connected with a trade or business nor entered into for profit, as is the case here,[12] qualifies for a deduction only if it arises from "fire, storm, shipwreck, or other casualty, or from theft." § 165(a), (c)(3).

### 1.     *Prerequisites for a theft loss deduction*

An individual claiming a theft loss deduction must show (1) that a theft occurred, (2) that there was no reasonable chance of recovery of the property, and (3) that he owned the property at the time it was stolen. *See Grothues v. Commissioner*, T.C. Memo. 2002-287. In dispute here is only the third prerequisite—i.e., whether the Pascuccis owned the assets in the separate accounts at the time of the theft by Mr. Madoff—but we discuss briefly the first two before addressing that dispute.

### a.     *Occurrence of a theft*

Theft for the purposes of section 165(c)(3) includes, but is not limited to, larceny, embezzlement, and robbery. Treas. Reg. § 1.165-8(d). The act resulting in the alleged theft loss must have been a criminal act under the law of the state in which the alleged theft occurred. *Paine v. Commissioner*, 63 T.C. 736, 740 (1975), *aff'd*, 523 F.2d

---

[12] The property for which the Pascuccis claim the theft loss deduction is the assets contained in the separate accounts of both MetLife and GenAm. However, as is discussed below, the actual property which the Pascuccis own are the policies and certificates with MetLife and GenAm, the value of which declined after the collapse of the Madoff Ponzi scheme. The parties apparently agree that neither policy was connected with a trade or business and that neither policy was entered into for profit.

**[\*14]** 1053 (5th Cir. 1975) (unpublished table decision); *Montelone v. Commissioner*, 34 T.C. 688, 694 (1960); *Allen v. Commissioner*, 16 T.C. 163, 166 (1951).

To be entitled to a theft loss deduction, the Pascuccis must establish that a theft occurred under New York law, because that is where Mr. Madoff's acts occurred. New York Penal Code § 155.05 (West 2023) provides that "[a] person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof."

This definition of larceny includes embezzlement, obtaining property by false pretenses, acquiring lost property, and false promise. *Id.* The parties agree that a theft was committed (i.e., by Mr. Madoff), but they disagree about whether that theft was from the Pascuccis. *See infra* Part II.C.3.

### b. *Prospect of recovery*

The regulations promulgated under section 165 provide, as to theft losses: "[I]f in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, see paragraph (d) of § 1.165-1." Treas. Reg. § 1.165-8(a)(2). The cross-referenced paragraph (d) provides rules about, inter alia, the year for which the deduction will be allowed when there is a prospect of recovery. The Commissioner does not contend that, by the end of 2008, there was a further prospect of recovery, so it is agreed that, if a theft loss deduction is permitted here, then 2008 is the correct year.

### c. *Ownership of the property*

The theft loss deduction is available only to the person who was the owner of the stolen property at the time it was criminally appropriated. *Lupton v. Commissioner*, 19 B.T.A. 166 (1930); *Grothues*, T.C. Memo. 2002-287; *Malik v. Commissioner*, T.C. Memo. 1995-204 (holding that the taxpayer who gave funds to a club's partners could not claim a theft loss deduction for funds embezzled from a club because the club (not the taxpayer) had possession and control, and therefore ownership, of the funds at the time they were embezzled).

As we discussed above in Part I.D.1.a., theft under New York law occurs when a person "wrongfully takes, obtains or withholds . . . property *from an owner* thereof." (Emphasis added.) The "owner" of

[*15] property under section 155.00 of the New York Penal Code is "any person who has a right to possession thereof superior to that of the taker, obtainer or withholder." In instances of joint or common ownership, and "[i]n the absence of a specific agreement to the contrary, a person in lawful possession shall be deemed to have a right of possession superior to that of a person having only a security interest therein". *Id.*

### 2.    *Safe harbor of Revenue Procedure 2009-20*

In response to the revelation of the Madoff Ponzi scheme, the IRS issued Revenue Procedure 2009-20, 2009-14 I.R.B. 749, to provide, for those claiming the deduction, a safe harbor that provides some clarity as to how the agency would apply the foregoing prerequisites. Under the IRS's guidance, a "qualified investor" is eligible to claim the deduction under the safe harbor. Rev. Proc. 2009-20, § 4.03, 2009-14 I.R.B. at 750, specifies that a qualified investor "does not include a person that invested solely in a fund or other entity (separate from the investor for federal income tax purposes) that invested in the specified fraudulent arrangement." Where such an investment had been made, only "the fund or entity itself may be a qualified investor within the scope of this revenue procedure." *Id.* The failure to meet the requirements of the safe harbor is not determinative of one's ability to claim a theft loss resulting from a Ponzi scheme. Rather, qualifying under the safe harbor assured taxpayers that their deduction would not be challenged by the IRS.

The Commissioner does not dispute that a theft occurred, and he concedes that there was no reasonable chance of recovery, leaving at issue only the question whether Mr. Pascucci owned the property at the time of the theft.

## II.    *Analysis*

The Pascuccis must demonstrate that they suffered a loss as a result of a theft in order to succeed in their claim of a theft loss deduction for the 2008 tax year (and of NOL carrybacks to previous years). For the reasons we now explain, we hold that Mr. Pascucci did not own the assets in the separate accounts at the time of the Madoff theft, and therefore the Pascuccis are not entitled to a theft loss deduction.

[*16] A.     *Eligibility through the Revenue Procedure 2009-20 safe harbor*

For CSP's direct investment in BLMIS, the Pascuccis qualify for the safe harbor of Revenue Procedure 2009-20 because they were qualified investors, and the Commissioner so concedes. However, the Pascuccis do not qualify for the safe harbor as to their investments in the variable life insurance policies, because in that context they were not qualified investors. They do not contend otherwise. As to the life insurance policies, Mr. Pascucci did not invest in a "fund or other entity . . . that invested in the specified fraudulent arrangement"; instead, he was further removed from the fraud. Each fund in which they invested (i.e., the separate accounts owned by GenAm and SELIC) had itself invested some of its money in "a fund or other entity" (Tremont) that in turn had invested 21.64% of its money in a fund (Rye Broad) that had invested all of its money in the "fraudulent arrangement"—BLMIS— from which the theft actually occurred. That is, the money in the separate accounts was not directly deposited with BLMIS and was not made subject to the Madoff Ponzi scheme. It was Rye Broad, not Mr. Pascucci, that deposited assets with BLMIS for an investment that never occurred. (The safe harbor would be unavailable even if we found that Mr. Pascucci himself was the owner of the assets in the separate accounts, since the investment from those accounts—indirectly through Tremont and then through Rye Broad—was still too far removed from the "fraudulent arrangement" of BLMIS.)

The safe harbor analysis, however, does not end this matter, since eligibility for the safe harbor is only one means to show entitlement to a theft loss deduction. The Pascuccis contend that they make that showing apart from the safe harbor.

B.     *Ownership of the assets in the separate accounts*

Under the express policy terms of both SELIC and GenAm, those companies owned the assets of the separate accounts during the 2008 tax year. The Pascuccis do not dispute this proposition, nor the Commissioner's showing that, under state law, the separate account assets are owned by the insurance companies.

The Pascuccis further admit that "for income tax purposes the insurance company owns the assets reflected in the separate account", and they admit that Mr. Pascucci is "deemed under the investor control doctrine to not own the separate accounts directly". (These admissions

[*17] benefit them as to favorable tax treatment of inside buildup.) However, they argue that even though Mr. Pascucci did not own the assets in the separate accounts under the terms of the accounts, under state law, or under the "investor control" doctrine, he nonetheless had "a property interest therein" and possessed sufficient "incidents of ownership" and "tax and economic benefits and burdens of appreciation and depreciation of the assets" to be considered the owner of the assets in the separate accounts for purposes of a theft loss deduction. We disagree.

Mr. Pascucci did not have investor control over the assets in the separate accounts. He had no control over the investment strategy of the assets once allocated; he had only typical policyholder rights under his policies and contracts; and the Pascuccis offer no evidence that they derived other benefits from any control over the assets in the separate accounts.[13]

It was Tremont's general partner who designated the investment managers for the funds in Tremont. Mr. Pascucci had no right and made no attempt to influence the selection of investment managers nor the making of investments by Tremont. That is to say, Mr. Pascucci's only role was to select the separate funds in which to put his premiums, and he had no control thereafter over the assets in the separate accounts. Whereas the investment manager in *Webber*, 144 T.C. at 361, acted only at the direction of the policyholder without any attempt to independently assess investment strategies, there is no evidence before us to suggest that Mr. Pascucci even contacted the investment managers for Tremont, let alone directed the investment managers' actions. According to Revenue Ruling 2003-91, these facts would indicate that the insurance company, rather than Mr. Pascucci, was the owner of the assets in the separate accounts—not only the owner of legal title (which it certainly was) but also the owner for tax purposes.

Mr. Pascucci's voting rights under the Policies were typical rights contemplated by state law and do not qualify as an incident of ownership of the assets underlying the Policies. MetLife allowed for voting rights to pass through to certificate holders, but MetLife still owned the shares and reserved the right to cease that practice at any time. New York

---

[13] Examples of these "other benefits" might include "investments that may have been a source of personal pleasure" and investments that mirror those of the policyholder's own private-equity fund or personal portfolio. *See Webber*, 144 T.C. at 367. The Pascuccis do not assert that Mr. Pascucci enjoyed such benefits.

**[\*18]** state insurance law permits this practice while maintaining that all assets in separate accounts nonetheless belong to the insurance company. *See* N.Y. Ins. Law § 4240(a)(12), (f) (West 2023). Likewise, Missouri insurance law permits insurance companies to allow special voting rights for individuals who have policies with separate accounts. Mo. Rev. Stat. § 376.309(3) (West 2023). The predictable, commonplace voting rights which Mr. Pascucci possessed are starkly different from the level of control over voting that the taxpayer exercised in *Webber*, 144 T.C. at 364–65. The insurance investment managers in *Webber* "took no action without a sign-off from [the taxpayer]." *Id.* Mr. Pascucci has provided no evidence that his level of control over voting habits of MetLife consisted of anything beyond the votes of his few shares.

Finally, Mr. Pascucci's limited—and never-exercised—ability to withdraw cash via loans from the policies does not reflect ownership over the assets in the separate accounts. As highlighted by the Commissioner, withdrawal could be made by requesting loans, but the amount available would be limited to the Insurance Account Value less certain adjustments, and then interest would be charged on the amount lent. Moreover, the certificate or contract would have to be assigned to the insurance company "as sole security for the loan." This restricted ability to withdraw does not resemble the kind of "unfettered command" over assets that is associated with investor control. *Corliss v. Bowers*, 281 U.S. at 378. Therefore, we find that, as to the assets in the separate accounts, Mr. Pascucci did not have significant "incidents of ownership" nor bear significant "benefits or burdens" and, consequently, that he did not own the assets in the separate accounts for theft loss purposes.

C.    *The Pascuccis' counterarguments*

1.    *Whether the Policies' diminution in value can support a theft loss deduction*

As we have held, Mr. Pascucci did not own the assets in the separate accounts maintained by GenAm and SELIC; instead, he owned the Policies those companies had issued to him. However, the Pascuccis argue that they are entitled to a theft loss deduction because the Policies suffered a diminution in value as a result of Mr. Madoff's theft from BLMIS. The Policies did indeed suffer a diminution of value as a result of the Madoff Ponzi scheme—with the result that the DOJ classified Mr. Pascucci as a "victim" for purposes of receiving compensation from the MVF—and the question we now face is whether such a diminution of value can support a theft loss deduction.

**[\*19]** Section 165(a) allows a deduction for "any loss", and subsection (e) specifies a "loss *arising from* theft". (Emphasis added.) One could argue that a loss may "aris[e] from theft" even if the specific property that was actually the subject of a theft (here, funds in BLMIS) is distinct from the property whose value diminished, if that theft causes a "loss" of part of the value of the distinct property (here, the Policies). For example, an heir may very understandably feel he has suffered such a "loss" when his parent is the victim of a theft. The heir anticipated inheriting the property, but now the heir has suffered a loss, so to speak, of what he expected to inherit, which loss one could say "arose from" the theft. Or, as another example, a creditor may similarly feel that he has suffered a "loss" when his debtor is the victim of a theft. The creditor expected the debtor to pay him from that property; but now the creditor will not be repaid and has suffered a loss, so to speak, that one could say "arose from" the theft.[14] Or a shareholder of a corporation may feel that he has suffered "loss" when the corporation is the victim of a theft that causes the market value of the stock to decrease. The shareholder could say that the decrease in his shareholder value "arose from" the theft suffered by the corporation.[15]

---

[14] In *Silverman v. Commissioner*, T.C. Memo. 1975-255, 34 T.C.M. (CCH) 1094, *aff'd*, 538 F.2d 320 (3d Cir. 1976) (unpublished table decision), a thief induced a loan to his MCC corporation by FSS corporation, whose owners advanced the money to FSS. The thief took the funds from MCC; FSS's loan to MCC was not repaid; and the owners' advance to FSS was not repaid. The Tax Court held:

> A theft loss deduction may be claimed only by the taxpayer who was the owner of the stolen property when it was criminally appropriated. . . .
> . . . FSS must be deemed to have sustained the theft loss for purposes of section 165. . . .
> . . . .
> . . . [P]etitioners intended to maintain FSS as an entity distinct from themselves. And they caused it to be sufficiently active that its existence should be recognized for purposes of the tax law. . . . Therefore we will not disregard the existence of FSS . . . .

*Id.* at 1096.

[15] Petitioners bring up this scenario and aptly state:

> [A] theft loss is not allowable because the loss did not arise from a theft. *See, e.g.*, *Marr v. Commissioner*, T.C. Memo. 1995-250, 1995 Tax Ct. Memo LEXIS 252, at \*9–11 (taxpayers not entitled to a theft loss deduction where they purchased stock on the open market because under state law a relationship between the defrauder and the victim was required for the activity to be a theft); *Crowell v. Commissioner*, T.C. Memo. 1986-314, 1986 Tax Ct. Memo LEXIS 288, at \*8–10 (same).

**[\*20]** However, the theft loss jurisprudence has not taken this interpretive path. Rather, the Court has confined the theft loss to the actual owner of the stolen property. *See infra* Part I.D.1.c. We assume it is true, as the Pascuccis contend, that, for some purposes, "property" can include rights under a contract; and we assume arguendo that the Policies could constitute "property" that, if stolen, would support a theft loss deduction. However, the Policies were not stolen. Rather, the property stolen was the money in BLMIS, while the property that was owned by Mr. Pascucci and that diminished in value was distinct property—the Policies.

The contract rights afforded to Mr. Pascucci under the Policies were the same before and after the collapse of the Madoff Ponzi scheme: Both before and after, Mr. Pascucci had variable life insurance policies which, upon death, would yield payment to the beneficiaries named in the policies. Further, there never was any guaranteed value for any of the Policies—rather, it was always true that, by their nature, the Policies might decline in value—and, therefore, the decline in value does not substantiate a theft from Mr. Pascucci.

2.  *Whether Mr. Pascucci had a property interest in the separate accounts*

In the alternative, the Pascuccis claim that Mr. Pascucci did have an ownership interest in the stolen property. They cite *Alphonso v. Commissioner*, 708 F.3d 344 (2d Cir. 2013), *vacating and remanding* 136 T.C. 247 (2011), a case involving a casualty loss (not a theft loss) in which a tenant-stockholder of a cooperative housing corporation ("housing co-op") was found to have a property interest in a wall within the common area of the community and was therefore entitled to a casualty loss deduction for damage to the wall. That is (the Pascuccis contend), even though what the taxpayer owned was his share in the housing co-op, he also was held to have an ownership interest in the wall owned by the housing co-op,[16] an ownership interest that would support a theft loss deduction. We are unconvinced, however, that Mr. Pascucci's rights under the policies and contracts materially resemble the rights afforded to a tenant and stockholder (i.e., co-owner) over real property.

---

[16] The court found that the interest created in a cooperative agreement is sui generis because "[t]he interest in a cooperative apartment 'is represented by shares of stock, which are personal property, *yet in reality what is owned is not an interest in an ongoing business enterprise, but instead a right to possess real property.*'" *Alphonso v. Commissioner*, 708 F.3d at 352 (quoting *In re Estate of Carmer*, 525 N.E.2d 734, 734 (N.Y. 1988)).

**[\*21]** The tenant in *Alphonso* had not only an ownership right in the housing co-op but also the right to enjoy common areas of the property, of which the wall was a part; and the tenant therefore suffered some loss of property when the wall was damaged. By contrast, Mr. Pascucci enjoyed no such rights to own, possess, or use the property that Mr. Madoff actually stole: the BLMIS funds. Instead, he had only limited rights to borrow against the assets in the separate accounts held by MetLife.

Moreover, as respondent noted, the analysis in *Alphonso* relied heavily on state law to determine what rights were generated pursuant to a lease by a tenant-shareholder of a cooperative apartment. While New York state property law at issue in *Alphonso* provided that a tenant-shareholder of a cooperative agreement holds a real property interest (i.e., an ownership interest) through a lease, *id.* at 353, the insurance law applicable here both in New York (the state whose law governs the SELIC policies) and in Missouri (the state whose law governs the GenAm policies) does not create an ownership interest in the assets of a separate account. Instead, New York insurance law mandates that assets "allocated by the insurer to separate accounts *shall be owned by the insurer*, [and] the assets therein *shall be the property of the insurer*", N.Y. Ins. Law § 4240(a)(12) (emphasis added), and Missouri insurance law, Mo. Rev. Stat. § 376.309(1) and (2), creates no further property rights in the assets held in the separate account.

The Commissioner points to a more apt case to address the Pascuccis' property interest argument: *In re Bernard L. Madoff Investment Securities, LLC*, 708 F.3d 422 (2d Cir. 2013). That case, also decided by the Court of Appeals for the Second Circuit, addressed the question of whether the appellants (individuals who owned limited partnership interests in a company that had invested in Rye Broad) were customers of BLMIS for purposes of bankruptcy proceedings. The court found that the appellants "had *no property interest in the assets that the Feeder Funds* [such as Rye Broad] invested with BLMIS". *Id.* at 427–28 (emphasis added). Mr. Pascucci's connection to BLMIS is even more attenuated, because he did not even have limited partnership interests in Rye Broad; in this case the interests in Rye Broad were owned by Tremont, the interests in Tremont were owned by the separate accounts, and the separate accounts were owned by GenAm and SELIC. Mr. Pascucci had no interests in Rye Broad (or BLMIS) but rather owned policies and contracts whose cash values reflected the values of separate accounts held by the insurance companies. It was those separate accounts, owned by the insurance companies in title and control, that

**[\*22]** purchased limited partnership interests in a partnership (Tremont) that then invested with Rye Broad and, thereby indirectly, with BLMIS.

> 3. *Whether there needs only to be a nexus between the reduction in value of the separate accounts and the Madoff Ponzi scheme*

The Pascuccis urge this Court to apply the "sufficient nexus" standard set forth in *Estate of Heller v. Commissioner*, 147 T.C. 370 (2016), i.e., to hold that Mr. Pascucci had a "sufficient nexus" to the assets in the separate accounts to claim a theft loss deduction, but that standard does not apply here. In *Estate of Heller*, the Court addressed an issue of first impression: whether an estate could claim a deduction under section 2054 (the estate tax version of the theft loss deduction) for the loss in value of an interest that the estate held in an LLC whose sole asset was an account with BLMIS that became worthless following the collapse of the Madoff Ponzi scheme. Section 165(c)(3) (the statute applicable here) allows a deduction for "losses *of property*" (emphasis added), while the text of section 2054 allows a deduction for "losses incurred". The text of section 2054, as the Court explained in *Estate of Heller*, 147 T.C. at 373, is broad, and that text warranted a broad interpretation. Section 165(c)(3), on the other hand, allowing a deduction only for "losses of property", provides a narrower scope of loss that warrants an income tax deduction. Further, our jurisprudence regarding section 165(c)(3) is, unlike that of section 2054 before *Estate of Heller*, clear and well settled.

> 4. *Whether Tremont and Rye Broad were "merely" middlemen*

Relying on our opinion in *Jensen v. Commissioner*, T.C. Memo. 1993-393, 1993 WL 325102, *aff'd*, 72 F.3d 135 (9th Cir. 1995) (unpublished table decision), the Pascuccis claim that Tremont and Rye Broad were merely middlemen[17] through which they invested in BLMIS.

---

[17] In their reply brief, the Pascuccis seem to contend not that Tremont and Rye Broad were middlemen acting for Mr. Pascucci (like the broker acting for the taxpayer in *Jensen*) but instead that they were middlemen acting for Mr. Madoff, serving as "conduits for Madoff and his Ponzi scheme". These allegations do not resonate with *Jensen*, and this contention fails for lack of evidence. To support it they are able to cite only hearsay accusations in pleadings filed against Tremont and Rye Broad, but the reply brief indicates that the cited litigation concluded without any admission or

**[\*23]** In *Jensen*, the taxpayers invested in a Ponzi scheme through a broker and subsequently claimed a theft loss deduction once the Ponzi scheme collapsed. *Id.* We held that, in that instance, the taxpayers' broker was a middleman, and the taxpayers were therefore entitled to a theft loss deduction, because the broker had acted on behalf of the taxpayers in making the investments. In *Jensen*, "[a]ll of the parties involved . . . understood that the funds that [the broker] provided to [the Ponzi scheme] were not merely [the broker's] funds but were also [the investing taxpayers'] funds." *Id.* at \*5. It would have been possible for the taxpayers in *Jensen* to invest in the Ponzi scheme directly without the broker, and the interposing of the middleman made no difference.

This case is quite different from *Jensen*. In *Jensen* the invested funds were held to be the taxpayer's funds, only nominally held by his broker, whereas here both the state statutes and the GenAm and SELIC documents repeatedly and explicitly provide that not the Pascuccis but the insurance companies own those assets. Moreover, the investment by MetLife in Tremont was in exchange for limited partnership interests that were available not to individual investors (such as Mr. Pascucci) but only to insurance company investors, as provided in the PPM given to MetLife by Tremont.[18] Unlike the investors in *Jensen*, the Pascuccis themselves could *not* have invested in Tremont on their own, without GenAm and SELIC. In this case it was certainly *not* true that (interpolating these facts into the discussion in *Jensen*) "[a]ll of the parties involved . . . understood that the funds that [the insurance companies] provided to [Tremont] were not merely [the insurance companies'] funds but were also [the Pascuccis'] funds." On the contrary, Tremont would have understood that the funds that the insurance companies provided to Tremont were the funds of the companies' separate accounts, which are assets owned by the insurance company and not by its policyholders. Much less would Rye Broad have

_____

adjudication of liability for wrong doing. In the end the contention devolves into the colloquialism that Tremont and Rye Broad "most certainly were conduits for money that Madoff stole". Money was not simply passed from Mr. Pascucci through entities to Mr. Madoff. Rather, Mr. Pascucci's money bought him Policies from the insurance companies; the insurance companies' money bought shares in Tremont; Tremont's money bought shares in Rye Broad; Rye Broad's money bought shares in BLMIS; and BLMIS's money went to a bank account that Mr. Madoff used. We can indeed trace the money, and we can blame Mr. Madoff for the diminution of value in Mr. Pascucci's Policies; but we cannot collapse or ignore the distinct transactions.

18 The description of the Tremont separate account in the PPMs from SELIC and GenAm to the Pascuccis also specified that the partnership interests were available only to insurance companies.

**[\*24]** "understood" that the funds it received from Tremont were Mr. Pascucci's. The Commissioner argues that the multiple layers of investment (Mr. Pascucci into the separate accounts, the separate accounts into Tremont, Tremont into Rye Broad,[19] and Rye Broad into BLMIS) sufficiently separate Mr. Pascucci from ownership of the BLMIS funds that Mr. Madoff stole, and we are inclined to agree. Consequently, we disagree that Tremont and Rye Broad were "merely" middlemen that we should ignore in determining ownership.

5. *Whether investor control is irrelevant if the property is stolen*

The Pascuccis' contention that the investor control doctrine does not apply to theft loss analysis is unavailing. The investor control doctrine was developed as a means to discern whether or not income accruing on assets held in separate accounts as part of a life insurance or variable annuity contract is taxable to the issuing insurance company or to the policyholder. As we explained above, tax liability attaches to the ownership of income. Consequently, the investor control doctrine, as it informs the determination whether income on assets is taxable to a policyholder is, in actuality, informing the determination whether that policyholder truly owns the assets in the separate accounts. Only the owner of an income-producing asset should owe tax on that income.

Similarly, entitlement to a theft loss deduction attaches to the ownership of the property. Only the owner of an asset may claim a theft loss deduction when it is stolen. It naturally follows that the application of the investor control doctrine is appropriate for informing the decision whether the policyholder owns the assets in the investment account.

In the alternative, the Pascuccis urge the Court to disregard the "*investor* control" doctrine in determining ownership of the funds, on the ground that the disputed funds were stolen by Mr. Madoff, not *invested* at all. As a result of this theft, the Pascuccis contend, there was no

---

[19] Tremont's general partner was, in 2009, also the general partner of the Rye Broad funds. *See supra* note 7. One could speculate that in 2001 and 2003 the Rye Funds might have been controlled by Tremont; that Rye Broad should be viewed as Tremont's alter ego; that the transactions between them should therefore be collapsed; and that the series of transactions should be deemed one transaction shorter. We have not been pointed to evidence in the record that would support this scenario, and we decline to speculate. And even if the series were one transaction shorter, there would still be multiple transactions among distinct parties that would separate Mr. Pascucci's investment in the separate accounts from Mr. Madoff's theft.

**[*25]** *investment* to have control over, and therefore the *investor* control doctrine is irrelevant. This contention is without merit because it asks the investor control question at the wrong stage—i.e., three transactions after the pertinent investment. The investor control doctrine, when invoked in this theft loss context, is helping us to answer the question of who owned the (later stolen) funds after they were invested in the insurance company (and *before* the theft occurred). Did Mr. Pascucci own the premiums even though he had invested them with an insurance company? There is no doubt that Mr. Pascucci paid his premiums to the insurance company as an investment and that the insurance company received them as an investment. No theft yet complicates the ownership question, the answer to which is simple: We know that the company—and not Mr. Pascucci—now owns the funds because the company, not the investor, controls the funds. When a theft thereafter occurs (three transactions later), it does not change our investor control analysis nor our occasion for employing it. We are able to say that no theft occurred *from Mr. Pascucci* because he did not own the asset after he made his investment. The later theft certainly did not cause Mr. Pascucci to become anything other than an investor.

6.    *Whether the tax deferral of the separate accounts has a bearing on the Pascuccis' entitlement to a theft loss deduction*

The Commissioner aptly observes that the Pascuccis benefited from deferral of tax on the separate accounts because they claimed that they did not own, and are treated as not having owned, the assets within the separate accounts. The Pascuccis apparently misunderstand this observation, and they rebut an argument that the Commissioner did not actually make—i.e., they deny that a prior tax deferral eliminates one's claim to a theft loss deduction. Such an argument would indeed have no merit; but the actual point to which the Commissioner's observation is relevant is that before the theft, the Pascuccis benefited from, and did not challenge, the fact that the assets contained in the separate accounts at issue were owned by MetLife and GenAm, and therefore, *because the Pascuccis did not own those assets*, they were not liable for any tax related to those assets. The Pascuccis cannot have it both ways: They cannot simultaneously enjoy the tax deferral benefit of *not* owning assets in the separate accounts and also claim a tax deduction that is a benefit available only to someone who *did* own the assets.

**[\*26]**      7.    *Whether the Madoff Victim Fund's determination that the Pascuccis were crime "victims" satisfies the section 165 requirement that the loss arise from a theft*

The Pascuccis argue that the relief provided to them as "victims" by the MVF is proof that they owned the assets in the separate accounts, that they suffered a theft, and that they are therefore entitled to their claimed theft loss deduction. We disagree. The MVF was created by the Department of Justice to provide some relief to the thousands of individuals affected by Mr. Madoff, with the understanding that indirect investors made up the majority of those thousands. The MVF was understood to be "unique" (i.e., generous and broad) because of its focus on the "ultimate investor" rather than on the feeder and mutual funds that had directly invested in BLMIS and that had actionable claims in bankruptcy actions. The Pascuccis have not shown that the MVF offered or announced (or had any authority to offer or announce) any federal tax rulings or principles. Rather, it determined that the Pascuccis were eligible to obtain relief from the MVF; but it made no determination as to whether the Pascuccis met the requirements of section 165 to be entitled to the theft loss deduction they seek. For the reasons stated above, they did not meet those requirements.

III.    *Conclusion*

The Pascuccis are not entitled to a theft loss deduction under section 165 for the diminution in value of the assets in the separate accounts, because they did not own the assets at the time of the theft.

To reflect the foregoing, and to effect the Commissioner's concession of the other miscellaneous deductions,

*Decision will be entered under Rule 155.*