Theodore R. Price and Lois S. Price v. Commissioner.
Price v. Commissioner
Docket No. 2093-70.
United States Tax Court
T.C. Memo 1971-323; 1971 Tax Ct. Memo LEXIS 8; 30 T.C.M. (CCH) 1405; T.C.M. (RIA) 71323; December 23, 1971, Filed. John T. Kay, Jr. Kay, Casto, Chaney, 511 Charleston Nat'l Bank Bldg., Charleston, W. Va., and Ralph C. Dusic, Jr., for the petitioners. Juandell D. Glass, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined deficiencies in the Federal income tax of petitioners as follows: Year
Deficiency
1963
$1,808.03
1964
138.09
1965
1,089.88
1966
6,741.25 Concessions having been made by the parties, the questions for decision are: (1) Whether amounts paid by petitioner Theodore R. Price in 1965 to Pinkerton, Inc. to enable the corporation to conduct an investigation of a prospective employee of Diversified Mountaineer Corporation were deductible by petitioners within the provisions of section 162; (2) Whether expenses incurred by petitioner Theodore R. Price in 1965 in an attempt to establish a national bank in Spring Hill, West Virginia are deductible by petitioners under section 162 or section 212, and, *10 if not, did the petitioners sustain a loss within the provisions of section 165; (3) Whether expenses incurred by petitioner Theodore R. Price, by and for his wife, petitioner Lois S. Price, at a banking convention, which were in fact reimbursed to him by his employer, Diversified Mountaineer Corporation (hereinafter sometimes referred to as "Diversified"), were deductible by petitioners within the provisions of section 162; (4) Whether petitioners sustained a theft loss within the provisions of section 165 in 1406 1966 as a result of a payment made by petitioner Theodore R. Price pursuant to the construction of petitioner's personal residence, and, if so, what amount is deductible by petitioner. [1]
Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits thereto are herein incorporated by this reference. The petitioners Theodore R. Price and Lois S. Price are husband and wife residing in Charleston, West Virginia. For the taxable years 1963 through 1966, they filed their joint Federal income tax returns with the district *11 director of internal revenue, Parkersburg, West Virginia. At all times material herein, petitioner Lois S. Price (hereinafter sometimes referred to as the "wife") was president and sole stockholder of Professional Management Agency, Inc. (hereinafter referred to as "Professional"). At all times material herein, petitioner Theodore R. Price (hereinafter sometimes referred to as "petitioner") was a stockholder, director, and executive vice president of Diversified. Sometime during the year 1965, Roger Baird was being considered by Diversified for employment as its controller. In relation to this matter, petitioner desired to hire Pinkerton, Inc. to conduct a background investigation of Mr. 1407 Baird. However, petitioner did not want Diversified to pay for this investigation because as controller of Diversified the newly hired individual would have access to the records of such investigation. Consequently, petitioner contacted Pinkerton, Inc. through the offices of Professional. Pinkerton, Inc. conducted the investigation, and petitioner paid them their fee of $307.25 out of his personal funds. In 1965, petitioner was paid by Diversified a flat sum of $12,000 to reimburse *12 him for undisclosed expenses incurred by him on its behalf. Petitioner failed to report this sum in his return, presumably on the basis that the expenses incurred equalled or exceeded the amount received. In addition, petitioner deducted on his return the payment of $307.25 to Pinkerton, Inc. as an additional expense incurred on behalf of Diversified. Also in 1965, petitioner was contacted by certain individuals who had organized a group to form a national bank in the Spring Hill section of South Charleston, West Virginia. Petitioner had previous experience in this area in that he had been employed by a national bank in suburban Philadelphia, Pennsylvania where he had helped to organize branch banks. He had also organized several savings and loan companies for Diversified as its employee. He agreed to act as a promoter to aid in the organization and formation of such bank. However, this promotional activity was not undertaken by petitioner in any capacity as an employee of Diversified. Pursuant to his agreement with the banking group, petitioner engaged in preliminary activities designed to organize and form a national bank. These activities included a thorough examination of the *13 proposed area of location, including surveying, mapping, and aerial photograph; the purchasing of options on parts of the land in this proposed area; the completion of forms pursuant to the application for a charter; and the obtaining of financial statements from each of the organizers. Expenses for these preliminar activities totaled $1,748.60 in the year 1965. All of these expenses were paid by petitioner out of his personal funds. He hoped, in turn, to be compensated for these personal expenditures either by monetary payment or by receipt of stock in the bank. He also expected to be employed by the bank as an officer or director. Later in 1965, petitioner met with the Comptroller of Currency for the State of Virginia in Richmond, Virginia. Subsequent to this meeting, petitioner was informed that a charter would not be issued for the proposed bank until it had more prominent organizers from the South Charleston area, plus additional capitalization of approximately $300,000. When the organizers learned of this, they decided not to go through with their plans to form the bank. Petitioner was never reimbursed for the expenses incurred by him in this matter. In 1965, petitioner and *14 his wife also attended a bankers' convention at White Sulphur Springs, West Virginia. The convention included activities planned specifically for the wives of the bankers and petitioner's wife participated in these activities. She also aided her husband in making business acquaintances. Petitioner's employer, Diversified, paid the petitioner $700 as a reimbursement for expenses incurred by him in attending the convention. A total of $212.07 of the $700 received is allocable to expenses incurred by and for petitioner's wife. On or about July 1, 1966, [2] petitioners entered into a contract with Woodroe & Co., Inc. (hereinafter referred to as "Woodroe") by which the company agreed to construct a residence for petitioners on a lot owned by them for a total price, including the costs of material men, subcontractors and laborers, of $64,000. Under the terms of the contract, petitioner was to make payments at four separate stages of completion as follows: (1) $9,500 when the first floor sub-flooring was laid; (2) $15,500 when the roof was on the house; (3) $23,000 when the heating, wiring, and plumbing were roughed in and plastering was completed; (4) $16,000 within ten days after *15 the house was completed. The president and sole stockholder of Woodroe was Mr. C. F. Woodroe (hereinafter referred to as "Mr. Woodroe"). Prior to entering into the contract, petitioners were acquainted with Mr. Woodroe in that he had constructed their previous residence and had aided them in acquiring the lot upon which the new residence was to be constructed. 1408 The first and second stages of completion were completed on or about July 25, 1966 and August 9, 1966, respectively, at which time petitioners made respective payments to Woodroe of $9,500 and $15,500 as specified under the terms of the contract. Sometime during the first week of September, 1966, petitioner asked Mr. Woodroe whether the material men and subcontractors on the contract were being paid, and Mr. Woodroe assured him that all payments were current. On September 11, 1966, Mr. Woodroe met with petitioners at the construction site and requested the $23,000 check which was to become due at the completion of the third stage of the contract. He insisted that the *16 payment was needed in order to pay a subcontractor who had been and was, at that time, working on the residence, and in order to purchase materials and labor to complete the contract. He told petitioners that, in any event, the third stage of the contract would be completed by the following day. Consequently, on September 12, 1966, petitioners paid to Woodroe the sum of $23,000. On November 15, 1966, Woodroe notified petitioners that it would be unable to complete the construction of their house, and authorized petitioners to take the steps necessary to complete it on their own. At this time, the third stage of the contract had not been completed, to wit, a substantial portion of the plastering had not been done. Throughout the period of construction of the residence, petitioners visited the construction site on a regular basis to check on the progress of their new residence. At all times, they had an opportunity to examine the house and to view its stage of completion. Beginning on November 15, 1966, and continuing through March 22, 1967, the following mechanics liens were filed by creditors of the company against the property of the petitioners upon which the construction had *17 been taking place: Date
Recorded
Lien Creditor
Amount
11-15-66
Jim Cowie
$1,245.00
11-18-66
O. D. Vannoy
198.00
11-19-66
Evans Lumber
496.51
11-28-66
Glidden Company
89.96
12- 1-16
Pfaff and Smith
1,104.61
12- 1-66
Banks-Miller
$ 253.09
12-10-66
A. D. Stover
1,713.18
12-15-66
Charles O. Moles
2,717.14
12-16-66
Orkin Exterminating
63.00
12-20-66
Kanawha Block
3,758.53
3-22-67
Charleston Heating Co 2,613.78
Total
[3] $14,252.80
In 1967, petitioners paid $9,030.96 in satisfaction of the mechanics liens filed against their property, except for the liens by Vannoy and Charleston Heating Co., which were not paid. Woodroe had also incurred costs of $520.88 through September 1, 1966, at Goldfarb Electric Co. Inc., for materials to be used in connection with the construction of the house of petitioners. The petitioners settled this account in April, 1967 by the payment of $307.54 to Goldfarb in full satisfaction of the $520.88. On February 20, 1967, in the United *18 States District Court for the Southern District of West Virginia, Woodroe was adjudicated an involuntary bankrupt. In the petition, it was admitted by Mr. Woodroe that Woodroe had been insolvent as of August 27, 1966. Petitioners had the construction completed by another builder, Robert E. Angsten, Inc. The cost of completing the house after it had been abandoned by Woodroe was approximately $66,000. Opinion I. Investingation Expense In 1965, Pinkerton, Inc. conducted an investigation on Mr. Roger Baird, a prospective employee of Diversified. Petitioner paid out of his personal funds $307.25 to Pinkerton, Inc. for its services in this matter. During that year petitioner, an employee, officer, and stockholder of Diversified, received from Diversified a flat sum of $12,000 as reimbursements for expenses incurred by him as an employee on behalf of the corporation. The petitioner deducted this sum of $307.25, in addition to excluding from income the $12,000 expense allowance. Petitioner claims that the payment to Pinkerton, Inc. was made by him as an employee on behalf of his employer, Diversified. Consequently, he contends that such payment is deductible by petitioners under *19 sections 162 and 62. The record shows unequivocally that the expense of obtaining the Pinkerton, Inc. 1409 investigation was a necessary and ordinary business expense of Diversified, within the provisions of section 162. Section 62 provides that when an employee incurs such expenses on behalf of his employer under a reimbursement agreement with such employer, the reimbursed expenses are deductible by the employee in computing adjusted gross income. Further, when the amount of reimbursement is less than the total of the employee-related expenses, then a certain amount of the additional expenses are also deductible by the employee. [4] Petitioner, claiming that the payment to Pinkerton, Inc. was an employee-related expense, contends that his other expenses as an employee of Pinkerton, Inc. in 1965 exceeded his expense allowance of $12,000, and that consequently the $307.25 is deductible by petitioners in computing adjusted gross income. *20 In this case, however, we are not dealing with an expenditure which has any relationship to the petitioner's duties as an employee. Rather, petitioner voluntarily assumed payment of the Pinkerton, Inc. fee because petitioner determined that the expenses in conducting the investigation would best be incurred by him rather than Diversified. Clearly, this was an expense of the corporation that the petitioner was under no obligation to pay in the course of his employment. The employee who voluntarily incurs an expense of his corporate employer does not thereby become entitled to the deduction. It remains the "ordinary and necessary expense" of the employer. See Horace Podems, 24 T.C. 21 (1955). II. Banking Expense In 1965, petitioner was approached by a group of individuals who were interested in forming a national bank in South Charleston, West Virginia. Petitioner agreed to help organize the national bank. He was familiar with the procedures necessary to do this, since he had helped to organize several banking institutions as an employee of a national bank in Philadelphia *21 and as an employee of Diversified. In conducting preliminary activities pursuant to organizing the national bank, petitioner personally incurred expenses totaling $1,748.60. He expected to be compensated for his efforts either in cash or by receiving an interest in the new bank. He also anticipated that he would be made an officer or director of the new bank. However, during his organizational activities the petitioner was informed by the Comptroller of Currency for the State of Virginia that the bank would be unable to obtain its charter without an increase in the number of organizers and an increase in capitalization. Subsequently, in the latter part of 1965, the organizers decided to abandon the project. Petitioner was never reimbursed for his expenses. Petitioner claims that the amounts so expended are deductible by him either as business expenses under section 162[5] or as expenses incurred for the production of income under section 212. [6] In the alternative, he takes the position, that in any event, the amounts expended are deductible under section 165(c)(2) in the year in which the project was abandoned. [7]
*22 1410 The expenses are not deductible under section 162. While petitioner was experienced in the organization of banking institutions, the record does not show that he was in the trade or business of being an independent promoter. To the contrary, the record shows that his trade or business was being a corporate employee, and any prior activities in the promotional field by petitioner had been as a corporate employee. Neither are the expenses deductible under section 212. In Morton Frank, 20 T.C. 511 (1953), with similar facts, this Court disallowed the deduction, stating at p. 514: * * * There is a basic distinction between allowing deductions for the expense of producing or collecting income, in which one has an existent interest or right, and expenses incurred in an attempt to obtain income by the creation of some new interest. * * * Hence, until the charter was granted, there could be no production of income. Until that time, the expenses were merely capital expenditures. Dwight A. Ward, 20 T.C. 332 (1953); Mid-State Products Co., 21 T.C. 696 (1954). We do believe, however, that petitioner is entitled to a deduction under *23 section 165 (c)(2) for a loss sustained in 1965, the year the project was abandoned. Since the expenses could have been capitalized if the project had proven successful, we see no reason not to allow the deduction of these expenditures as a loss when the project is abandoned. Relying on Morton Frank, supra, respondent argues that petitioner's activities in organizing the bank were merely investigatory in nature, and consequently did not constitute "a transaction entered into for profit" within the meaning of section 165(c)(2). In Frank the taxpayer incurred expenses in exploring the possible purchase of an existing business. In this case, petitioner was attempting to form a new business, and engaged in activities directly relevant and material to that formation. These are precisely the type of activities that were held by this Court to be sufficient to meet the requirements of the statute in Charles T. Parker, 1 T.C. 709 (1943), acq. 1943 C.B. 37, where this Court stated at p. 711: The operations were preliminary to making arrangements for permanent operations, it is true. But they were actual operations and the fact that they did not *24 result in a permanent undertaking does not take the transaction outside the statutory provision. * * * Respondent has favorably noted the distinctions between Frank and Parker. Rev. Rul. 57-418, 1957-2 C.B. 143. Respondent also argues that the year of abandonment has not been determined with reasonable accuracy. On the basis of the evidence before us, we are convinced that the project was abandoned in 1965. Consequently, we find and hold that petitioner is entitled to deduct his loss under section 165(c)(2) in that year. III. Convention Expense In 1965, petitioner and his wife attended a banker's convention in White Sulphur Springs, West Virginia. Petitioner was present in his capacity as an employee of Diversified. At the convention, the petitioner's wife attended activities planned for the wives and otherwise aided the petitioner in making business acquaintances. Diversified paid the petitioner $700 as a reimbursement for expenses incurred by him in attending the convention, $212.07 of which was attributable to expenses incurred by or for petitioner's wife. Petitioner claims that the expenses incurred on behalf of the wife are deductible as a business expense *25 under section 162. To qualify for this deduction, the regulations require the taxpayer to show that the wife's presence on the trip has a bona fide business purpose. Sec. 1.162-2(c), Income Tax Regs., Sec. 1.274-5(c)(2)(B), Income Tax Regs.
Petitioners argue that Mrs. Price's presence was essential in order for petitioner to make the desired business contacts. However, the petitioner did not show that Mrs. Price performed any necessary business function. As a result, we find and hold that the deduction claimed for the wife's expenses in the amount of $212.07 will not be allowed. See Challenge Manufacturing Co., 37 T.C. 650, 661 (1962). IV. Theft Loss By a contract dated July 1, 1966, petitioners entered into a contract with Woodroe for the construction of their new residence. The contract price was $64,000, and, under the terms of the contract, payments were to be made by petitioners at four separate stages of completion, as follows: 1411 (1) $9,500 when the first floor sub-flooring was laid; (2) $15,500 when the roof was on the house; *26 (3) $23,000 when the heating, wiring, and plumbing were roughed in and plastering was completed; (4) $16,000 within ten days after the house was completed. The first and second stages of completion were met and payments were made by petitioners without incident. Sometime during the first week in September, 1966, petitioners asked Mr. Woodroe whether the material men and subcontractors on the contract were being paid, and Mr. Woodroe assured him that all payments were current. Either one or both of the petitioners examined the construction on almost a daily basis. On September 11, 1966, they were both at the construction site when Mr. Woodroe approached them. At that time, Mr. Woodroe asked the petitioners for the third payment on the contract. He told the petitioners that he needed the money in order to pay a subcontractor who had been and was, at that time, working on the residence, and to have the capital needed to finish construction on the house. He assured the petitioners that the third stage of completion would be finished by the following day. On September 12, 1966, petitioner paid by check to Woodroe the sum of $23,000. On November 15, 1966, Mr. Woodroe informed *27 petitioners that his company would not be able to complete the contract. At that time the third stage of completion had not been completed. On February 20, 1967, Woodroe was adjuicated to be an involuntary bankrupt. Petitioners claim that Mr. Woodroe's statements leading to the third payment constituted a violation of West Virginia law, and that the resulting loss suffered by the petitioners, in the amount of $23,000, was a "theft loss" within the meaning of section 165. It is well established that the factual existence of a theft or related crime must be determined under applicable state law. Saul M. Weingarten, 38 T.C. 75 (1962); Michele Monteleone, 34 T.C. 688 (1960); Edwards v. Bromberg, 232 F. 2d 107 (C.A. 5, 1956). W. Va. Code Ann., sec. 61-3-24 (1966), provides in pertinent part as follows: If any person obtain from another, by any false pretense, token or representation, with intent to defraud, money, goods or other property which may be the subject of larceny, * * * he shall, * * * be deemed guilty of larceny; * * * *28 Larceny constitutes a theft for purposes of section 165. Sec. 1.165-8(d), Income Tax Regs.In order to prove a violation of sec. 61-3-24, the following elements must be proven: (1) an intent to defraud; (2) the commission of an actual fraud (which, in turn, involves an act of deception); (3) the false pretenses used for purposes of perpetrating the fraud; (4) that the fraud was accomplished by means of the false pretenses used. State v. Pishner, 78 S.E. 752 (W. Va. 1913). In considering whether the facts as alleged and proven by the petitioner would, under the foregoing definition, prove a violation of the West Virginia law so as to give rise to a theft loss under section 165, we are faced at the outset with a failure on the part of the petitioners to report or to charge such crime with the proper local authorities. The same facts were fully known to the petitioners at the time they sustained their loss. If the petitioners then believed that a crime had been committed, it was their duty to take appropriate *29 action. It is true this Court has held that the deduction for theft does not depend upon whether the thief is convicted, or even prosecuted. Paul C.F. Vietzke, 37 T.C. 504 (1961); Warner L. Jones, 24 T.C. 525 (1955). Here, however, the fact that no crime, i.e., "theft," was even charged or claimed by the petitioner, other than in an effort to characterize his loss for tax purposes, raises grave doubts as to whether the deception necessary to create an "actual fraud" is prisent in this case. In any event, even if we examine the evidence presented by the petitioners, we do not believe that they have proven that there was a violation of the pertinent West Virginia law. With respect to the statements made by Woodroe concerning amounts needed to pay the subcontractor, the testimony is far from clear. There is some evidence to the effect that Woodroe was insolvent at the time of the allegation, but it is not clear that, at the time the allegation was made, Mr. Woodroe was aware of this fact, or that he did not intend to pay the subcontractor and complete the house. 1412 Petitioners have thus failed to prove that Mr. Woodroe made this allegation with *30 any intent to defraud petitioners. With respect to the statements made by Woodroe concerning the progress of the house, it also appears highly doubtful that the petitioners were deceived. Either one or both of the petitioners visited the construction site virtually every day during this period. Both were at the site with Mr. Woodroe at the time the alleged misrepresentations were made. They had ample opportunity to examine the house and to determine whether the third stage of completion would be finished by the next day, as promised by Mr. Woodroe. Until such time as the third stage of completion was met, petitioners were under no legel duty to make the $23,000 payment. If Mr. Woodroe attempted to induce petitioners to make this payment prematurely, they certainly were not, or ought not to have been, ignorant of the stage of completion of the house. Consequently, there was no violation of the pertinent West Virginia law. See Horton v. Tyree, 135 S.E. 597 (W. Va. 1926), where the court held that to constitute a fraud, the injured party must be ignorant of the deception being *31 practiced upon him. We accordingly find and hold that petitioners have failed to prove that they suffered a theft loss in 1966 within the meaning of section 165. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. While the contract was dated July 1, 1966, it apparently was not actually signed until sometime during the second week of July, 1966.↩
3. The parties stipulated that the total of the amounts stated above was $14,252.10; however, we have determined that the correct figure is the amount set forth above.↩
4. Section 1.62-1(f)(1), Income Tax Regs., provides as follows: Expenses paid or incurred by an employee which are deductible from gross income under part VI in computing taxable income and for which he is reimbursed by the employer under an express agreement for reimbursement or pursuant to an expense allowance arrangement may be deducted from gross income in computing adjusted gross income. Where an employee is reimbursed by his employer in an amount less than his total expense, and the reimbursement is intended to cover all types of deductible expenses, expenses other than those described in section 62(2)(B), (C), and (D) are taken into account in computing adjusted gross income in an amount which bears the same ratio to the amount of the reimbursement as the total amount of deductible expenses computed without those described in section 62(2)(B), (C), and (D) bears to the total amount of deductible expenses, including those described in section 62(2)(B), (C), and (D)↩.
5. Section 162 provides in pertinent part: (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * ↩
6. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; * * * ↩
7. SEC. 165. LOSSES. (a) General Rule. There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -in the case of an individual, the deduction under subsection (a) shall be limited to - * * * (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *↩