# United States Tax Court

T.C. Memo. 2025-16

HEATHER WESTON,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

STEWART WESTON,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 1289-20, 1290-20.              Filed February 12, 2025.

————

*Steven Ray Mather* and *John Adam Barker*, for petitioners.

*Timothy Duong, Sheri Ann Wight, Kristin M. Bourland, Michelle A. Monroy*, and *Kim-Khanh Nguyen*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: In these consolidated cases, the Commissioner determined deficiencies for tax year 2017 of $169,362 for Petitioner Heather Weston and $210,500 for Petitioner Stewart Weston, plus additions to tax under sections 6651(a)(1) and (2) and 6654 for both Petitioners.[1]  The Westons, a married couple, disagree with the

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation

[*2] Commissioner's proposed disallowance of a $2.1 million loss deduction and imposition of additions to tax for their 2017 tax year. The Westons contend that they sustained a loss in connection with Mr. Weston's investments in two business ventures in Indiana: a home renovation business and a demolition/excavation business. The Commissioner argues that the Westons have not provided sufficient evidence that they incurred any losses related to those business ventures—at least not as of yearend 2017—because the Westons made capital investments and have not shown that divestment occurred in 2017.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The Stipulation of Facts, Supplemental Stipulation of Facts, and attached Exhibits are incorporated by this reference. The Westons resided in California when they timely filed their Petitions.

I.     *Indiana Investments*

Mr. Weston has worked as a commercial real estate agent in California since graduating from college in 1990. In 2011 or 2012 his barber introduced him to a man named Jeffrey Broughton. At the time, Mr. Broughton was a construction and renovation manager for a nationwide firm that bought properties in bulk, renovated them, and resold them. In 2014 Mr. Weston (in his individual capacity, separate from his commercial real estate work) agreed with Mr. Broughton to fund the nationwide firm's acquisition of seven single-family homes in the Midwest, and Mr. Weston received a return on his investment within three or four months. Mr. Weston made the investment through ADR Homes, LLC (ADR Homes), a California limited liability company of which Mr. Weston was the sole member and manager at all relevant times. ADR Homes was treated as a disregarded entity for tax purposes.

Soon after, Mr. Broughton approached Mr. Weston about investing in single-family homes in Kokomo, Indiana. This investment would be made between Mr. Broughton and (via ADR Homes) Mr. Weston—that is, separate from the nationwide firm for which Mr. Broughton had been working. Mr. Weston traveled from his home in California to Kokomo to meet with Mr. Broughton, other potential

_____

references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*3] investors, and the Kokomo mayor, who promised municipal support for Mr. Broughton's vision of revitalizing the city through property renovations. In 2015 Mr. Weston agreed to give Mr. Broughton about $75,000 to acquire 30 homes in Kokomo that were available for purchase at an auction, held by the local county tax assessor, of homes whose owners were delinquent on their property taxes (Tax Deed Properties). That auction occurred in March 2015, at which time Mr. Broughton purchased the 30 Tax Deed Properties on his and Mr. Weston's behalf.

On the basis of Mr. Broughton's representations, Mr. Weston expected that each of the Tax Deed Properties would require about $15,000 in renovations and then would be sold for $30,000 to $40,000. Mr. Weston and Mr. Broughton agreed orally that income and profits would be shared as follows: Mr. Weston would receive back his initial investment, plus an 8% return on that investment; all further profits (if any) would be split 50-50. Mr. Weston and Mr. Broughton never reduced this agreement to writing nor signed a partnership agreement to memorialize it.

The original owners of the Tax Deed Properties had approximately one year to redeem their homes after the auction, during which Mr. Weston and Mr. Broughton could not take title. After the redemption period expired in April 2016, Mr. Broughton effected transfers of the Tax Deed Properties titles to "ADR Properties, LLC" (as listed on the deeds). Mr. Weston did not become aware that the deeds listed "ADR Properties, LLC" (rather than "ADR Homes, LLC") until 2018, as discussed further below.

Also in 2016, Mr. Weston began supplying funds for a demolition/excavation business run by Mr. Broughton through Freedom First Excavating and Demo, LLC (Freedom First). Mr. Broughton, acting on behalf of Freedom First, submitted bids to various Indiana cities to demolish older structures and deliver the vacant lots back to them. The cities sometimes required Freedom First to remediate the soil on the property (for instance, to remove lead contamination). As with the home renovation business, Mr. Weston and Mr. Broughton orally agreed to split profits from the demolition/excavation business.[2]

Once the title transfers for the Tax Deed Properties had been completed, Mr. Broughton or his assistant, Shelley Jackson, would call

---

[2] Unlike with the home renovation business, the record does not reflect the details of Mr. Weston and Mr. Broughton's oral agreement to split profits from the demolition/excavation business.

[*4] Mr. Weston or his operations manager, Laneshia Stamm, about once every week or two to request funds for ongoing renovations, for demolition and excavation expenses, and for purchasing more homes or other real estate. Mr. Broughton also arranged for itemized invoices to be sent to Mr. Weston weekly or biweekly. Mr. Weston or Ms. Stamm would wire funds to Mr. Broughton or to third parties as requested.

In February 2017 Ms. Stamm visited Kokomo and drove past two of the Tax Deed Properties for which Mr. Weston had sent renovation funds, noticing that no renovation progress was apparent. Despite Ms. Stamm's report of these troubling observations, and despite Mr. Broughton's not providing much information on the renovations, Mr. Weston retained his confidence in Mr. Broughton for a time because of his earlier successful investment (when Mr. Broughton was still working for the nationwide firm) and Mr. Broughton's perceived good reputation through his relationship with the Kokomo mayor and other local officials.

However, Mr. Weston's confidence in Mr. Broughton eventually waned, and towards the end of 2017 Mr. Weston stopped agreeing to invest in new home renovation projects with Mr. Broughton. He was concerned about his mounting investments and the lack of any returns. Beginning in October 2017, the amounts invoiced to Mr. Weston by Mr. Broughton for home purchases and renovations steadily decreased, from $8,760 on October 6 to around $800 in each week of December. (The final 2017 home renovation-related invoice is dated December 29, 2017, and the record does not contain any later invoices.) Nonetheless, Mr. Weston continued to fund the demolition/excavation business, regularly wiring funds to Mr. Broughton, Freedom First, or third parties in connection with that business, typically in amounts exceeding those listed in the invoices for the same time periods. Although amounts invoiced by Mr. Broughton for the demolition/excavation business ended on December 30, 2017, Mr. Weston continued to allow funding of that business well into 2018.

At the end of 2017 Mr. Weston began negotiating with Mr. Broughton to purchase real properties at 503–505 North Buckeye Street in Kokomo that then housed a café, a bakery, and Mr. Broughton's personal residence (Buckeye properties). SLH Property Investments, LLC, a California limited liability company of which Mr. Weston was the sole member and manager, consummated the purchase of the Buckeye properties in January 2018 for over $700,000 (including $276,307 forgiveness of debt), on the condition that Mr. Broughton

[*5] vacate the premises.  Mr. Broughton then left Kokomo and ceased his business activities there.

II.    *Post-2017 Events*

At some point after 2017, Ms. Stamm edited a spreadsheet originally compiled by Ms. Jackson that listed amounts paid by Mr. Weston between January 20, 2016, and December 30, 2017, in connection with the home renovation and demolition/excavation businesses. Ms. Stamm cross-checked the original spreadsheet against Mr. Weston's various bank statements and the invoices from Mr. Broughton.  She also highlighted the payments related to the demolition/excavation business to distinguish them from those related to the home renovation business.  The payments for both businesses listed in the edited spreadsheet (Indiana payments) total $2,110,412.

In August or September 2018, after discovering that the deeds for the Tax Deed Properties listed an incorrect entity as owner, Mr. Weston arranged for ADR Homes to execute a quitclaim deed to transfer the properties from ADR Properties, LLC to ADR Homes.  The quitclaim deed recited that ADR Homes was "previously mistakenly referred to as ADR Properties LLC." Mr. Weston then began the process of liquidating all properties that ADR Homes owned in Kokomo (both the Tax Deed Properties and others).  In 2018 ADR Homes sold 12 of the Tax Deed Properties.  The Westons listed only ten of these properties on Form 8949, Sales and Other Dispositions of Capital Assets, on their 2018 tax return, reporting aggregate proceeds of $257,857 and an aggregate basis of $293,355.  The record is unclear as to why the Westons did not report all 12 of the property sales.[3]  In 2019 ADR Homes sold seven additional properties.  The Westons listed four of these properties on Form 8949 of their 2019 tax return, reporting aggregate proceeds of $68,528 and an aggregate basis of $5,555.[4]  Of the Kokomo properties that ADR Homes acquired in connection with the home renovation business, the Westons reported rental income from four of those properties on their 2018–21

---

[3] One of the omitted properties yielded only $2,057 in proceeds.  The other omitted property yielded $22,000, and that property was listed as a rental on the Westons' 2018 return.

[4] Three of these four properties (1054 E. Richmond St., 1436 E. Jefferson St., and 609 E. Taylor) were listed as sales on both the 2018 and 2019 tax returns (albeit with different proceed amounts in each year), and the parties stipulated that these properties were sold in both years.  No explanation was given for the dual-year reporting.

[*6] tax returns.  As of February 2023, ADR Homes still owned 11 Tax Deed Properties.

Mr. Weston dealt even more proactively with the demolition/excavation business after 2017.  He made at least 14 payments between January and April 2018 to Bunn Trucking, the company that Freedom First hired to supply dumpsters at demolition sites.  He also paid Ms. Jackson's salary in at least April through June 2018.  Sometime in late 2017 or early 2018, Mr. Weston fielded a call from a woman in Indiana who had contracted with Freedom First for work on her property.  The work had not been done; instead, a Freedom First excavator had been parked on her front lawn for close to a month, with no word from Mr. Broughton.  Mr. Weston ultimately agreed that the woman could keep the excavator.  Also, in dealing with the contracts involving Freedom First, Mr. Weston (directly or indirectly) received title to a home in Culver, Indiana, as compensation for demolition work completed earlier for the Culver Academies.  On Form 8949 of their 2018 tax return, the Westons reported $81,415 of proceeds from "Freedom First."

On April 25, 2018, Mr. Weston sent the following text message to Mr. Broughton:

> Jeff, any chance we can schedule a day together[?]  I'll head back out to Kokomo/[C]ulver in a few weeks.  We need to get our hands around the portfolio.  I haven't heard back from you on any of the emails/texts I sent since we met last week.  We need to make sure we reconcile the purchase prices, renovations, expenses, income, debt for every deal.

On May 26, 2018, Mr. Weston sent the following text message to Mr. Broughton, Ms. Stamm, and one other (unidentified) recipient:

> What is the status of the [F]reedom [F]irst receivables that we are expecting[?]  Under no circumstances are those funds to be used for anything other than paying down my credit card.

In July 2018 an official from Pulaski County, Indiana, reported to Ms. Stamm by email that Freedom First had left an "incomplete job" in Medaryville, Indiana, and had failed to respond to phone calls.  This official also reported that a check for $11,800 from Pulaski County to Freedom First had been deposited on or around January 26, 2018. Days later, Ms. Stamm asked Ms. Jackson by email whether Mr. Broughton

[*7] had cashed the check and kept the proceeds for himself, to which Ms. Jackson replied: "When I asked him, he said he did not remember getting it, but it could very possibly be true."

Mr. Weston sent the following text message to Mr. Broughton on an unknown date:

> Jeff, I totally get it. I will never recover from our ventures in Indiana. It is absolutely not right to take rents from the building and not pay the outstanding liens, which were just uncovered. I can't absorb more. I am taking a huge loss in every deal, every deal. It will take me 2+ years to unravel. My retirement is wiped out.

Mr. Broughton replied, in part: "You told me to use rents to pay utilities and mortgage payments."

On December 6, 2018, Mr. Weston and Ms. Stamm flew to Indiana to try to track down Mr. Broughton. They could not find him but did get some documents from Ms. Jackson. At the end of 2019 Mr. Weston and Ms. Stamm contacted an attorney about possible litigation against Mr. Broughton. The attorney recommended speaking with criminal authorities, including the FBI, although Mr. Weston and Ms. Stamm never did so.

III. *Tax Returns and Notices of Deficiency*

The Westons requested an automatic extension of the deadline to file their 2017 federal income tax return, but they did not file a return by the extended deadline of October 15, 2018. On September 25, 2019, following an examination for the Westons' 2017 tax year and pursuant to section 6020(b), the Commissioner executed substitutes for returns (SFRs) for Mr. Weston's 2017 tax year and Mrs. Weston's 2017 tax year, respectively, showing tax due (not including additions to tax and interest) of $210,500 for Mr. Weston and $169,362 for Mrs. Weston. Neither of the SFRs prepared for the Westons includes Form 1040, U.S. Individual Income Tax Return, or a transcript of account. However, each of the SFRs does include (1) Form 13496, IRC Section 6020(b) Certification, (2) Form 4549–A, Report of Income Tax Examination Changes, (3) Form 5278, Statement - Income Tax Changes, and (4) Form 886–A, Explanation of Items.

On October 17, 2019, the Internal Revenue Service (IRS) mailed separate Notices of Deficiency to Mr. and Mrs. Weston for their 2017 tax

[*8] years, determining as deficiencies the amounts shown as due in the SFRs, plus additions to tax for failure to timely file, failure to timely pay, and failure to make estimated tax payments.

On January 8, 2020, the Westons signed a joint Form 1040 for their 2017 tax year, showing (among other things) a theft loss of $2,035,914 and tax due of $36,502. The IRS has not processed that return. As of the date of trial, the Westons had not made any income tax payments related to their 2017 tax year.

## IV.    *Issues for Decision*

Before trial the parties stipulated most components of the Westons' 2017 income tax liability. In the Stipulation of Settled Issues, the parties state that the remaining issues in dispute are (1) whether the Westons are "entitled to deduct a loss in an amount up to $2,035,914.00 either as a theft loss . . . or an ordinary trade or business loss" and (2) whether the Westons are liable for additions to tax under sections 6651(a)(1) and (2) and 6654.

In their posttrial briefs, the Westons claim entitlement to a deduction of $2,110,412, i.e., the sum of the Indiana payments. They list the following as their primary, secondary, and tertiary positions regarding the claimed deduction: First, the Indiana payments were trade or business expenses under section 162(a); second, the Indiana payments gave rise to a trade or business loss under section 165(c)(1); and third, the Indiana payments gave rise to a personal theft loss under section 165(c)(3).

## OPINION

## I.    *Burden of Proof*

Generally, the Commissioner's determinations in a Notice of Deficiency are presumed correct, and the taxpayer bears the burden of proving them erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The burden of showing entitlement to a claimed deduction is on the taxpayer. *See* Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). The Westons do not contend, and the evidence does not establish, that the burden of proof has shifted to the Commissioner under section 7491(a) as to any issue of fact.

[*9] II.    *Deductibility of the Indiana Payments*

Before trial the Westons advanced their first and second legal positions (viz, that the Indiana payments were business expenses and that they gave rise to a business loss) as alternative positions. They might appear to have abandoned the first position by virtue of agreeing to the above-mentioned statement of the remaining issues in the Stipulation of Settled Issues. However, the Commissioner did not object to the Westons' raising the first position in their posttrial briefs, and he addressed that position thoroughly in his Answering Brief. Thus, we will address all three of the Westons' legal positions regarding the Indiana payments.

A.    *Whether the Westons May Deduct the Indiana Payments as Business Expenses*

The Westons contend that they may deduct the Indiana payments as business expenses under section 162(a).[5] Section 162(a) provides, in relevant part: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ."

Whether a taxpayer carried on a trade or business depends on the facts and circumstances of each case. *Commissioner v. Groetzinger*, 480 U.S. 23, 36 (1987). There are three criteria that are generally accepted as indicative of carrying on a trade or business. First, the taxpayer must undertake an activity intending to earn a profit; second, the taxpayer must be regularly and actively engaged in the activity; and third, the taxpayer's business activities must actually have commenced. *See Sestak v. Commissioner*, T.C. Memo. 2022-41, at *7.

---

[5] In their Answering Brief the Westons represent that "Stewart and Broughton had an informal partnership by which Stewart would fund the improvement of the Tax Deed Properties and the ongoing Freedom First excavation expenses and Broughton would do the work." Such an arrangement would ordinarily be characterized for tax purposes as Mr. Weston's making contributions to a joint venture or partnership between him (in his individual capacity or via ADR Homes) and Mr. Broughton and/or Freedom First, such that the tax consequences for the Westons would depend on subchapter K of the Code, not section 162(a). That is, the Indiana payments would simply increase Mr. Weston's basis in his joint venture or partnership interest(s). *See* I.R.C. § 722. However, neither party advanced this legal argument, and we will deem it conceded. *See Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned.").

**[\*10]** The Commissioner has conceded that, as to both the home renovation business (which undertook to improve real estate and resell it) and the demolition/excavation business, Mr. Weston has proven two criteria: he intended to make a profit, and business activity was commenced in or before 2017. However, Mr. Weston must still show regular and active engagement in the businesses. To determine whether a taxpayer was regularly and actively engaged in a trade or business, rather than simply making an investment in capital assets, we look at (among other factors) whether he consistently conducted his activities in a systematic and businesslike manner and whether he maintained books and records for the business. *See Evans v. Commissioner*, T.C. Memo. 2016-7, at \*27–28.

Mr. Weston was engaged full time with his California real estate brokerage business and rarely visited Kokomo (where the home renovation activity was based) or the Indiana sites where the demolition/excavation activity was occurring. In Mr. Weston's own words regarding the home renovation activity:

> I'm not [Mr. Broughton's] partner; I am an investor. I'm not in the day-to-day operations of what's going on. . . . It was all investor-based. [Mr. Broughton is] going to buy a building. Here you go. Let's go. I'm the investor. [Mr. Broughton is] going to do all the work. I get my eight-percent return on my equity. I get my equity back, and we'll split 50/50.

Mr. Weston made similar statements regarding the demolition/excavation business.

Just as important, the Westons have not provided any books and records for either business. Nor have they provided any substantive evidence regarding gross receipts or deductible expenses for 2017; instead, they provided invoices and a spreadsheet of funding that commingle amounts spent for capital assets, materials, and labor. When taxpayers offer the Court "what amounts in effect to a shoebox full of papers," we will not "undertake the task of sorting through the voluminous evidence . . . in an attempt to see what is, and what is not, adequate substantiation of the items on [the taxpayer's] returns." *Hale v. Commissioner*, T.C. Memo. 2010-229, 100 T.C.M. (CCH) 345, 347.

It is clear from the record that Mr. Weston invested in the businesses rather than actively running them. The Supreme Court has

**[\*11]** made clear that the management of one's investments, no matter how extensive, is not a trade or business for purposes of section 162(a). *Whipple v. Commissioner*, 373 U.S. 193, 200 (1963) (quoting *Higgins v. Commissioner*, 312 U.S. 212, 218 (1941)). Accordingly, the Westons may not deduct any of the Indiana payments as business expenses under section 162(a) because Mr. Weston did not regularly and actively engage in business activity; instead, he simply made investments.

B.   *Whether the Westons May Deduct the Indiana Payments as Trade or Business Losses*

The Westons alternatively posit that the business arrangements between Mr. Weston (through ADR Homes) and Mr. Broughton (in part through Freedom First) gave rise to a trade or business operating loss in 2017 in the amount of the funding made through the end of 2017. They contend that the Indiana payments are deductible as a business loss under section 165(a) and (c)(1), which provides:

Sec. 165.  Losses
     (a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
     . . . .
     (c) Limitation on losses of individuals.—In the case of an individual, the deduction under subsection (a) shall be limited to—
          (1) losses incurred in a trade or business . . . .

For the reasons discussed *supra* pp. 9–11 Mr. Weston's involvement in the Indiana activities did not rise to the level of a trade or business. Furthermore, even if it did, the Westons still do not qualify for a business loss deduction with respect to either the home renovation business or the demolition/excavation business. We will address each one in turn.

The home renovation business undertook to improve real properties and resell them. Section 263A(a)(1)(A) and (2) and (b)(2) generally require taxpayers to include in inventory costs both the "direct" and "indirect" costs of real or personal property acquired for resale. Treasury Regulation § 1.263A-1(e)(2) defines direct costs as the sum of direct material costs and direct labor costs, and Treasury Regulation § 1.263A-1(e)(3) defines indirect costs as all costs other than direct costs that "directly benefit or are incurred by reason of the

[*12] performance of production or resale activities." The invoices from Mr. Broughton do not indicate that any of the Indiana payments directed to the renovation business were not direct or indirect costs for purposes of section 263A. Therefore, since the Westons bear the burden of proof, we conclude that all of those payments would be includible in inventory costs and therefore recoverable for tax purposes only when the properties are sold. The record contains no evidence that the home renovation business resulted in sales or dispositions of any property in 2017. (For instance, none of the Tax Deed Properties were disposed of until 2018.) The Westons assert that the Tax Deed Properties were worthless in 2017, but that assertion is belied by the fact that they collected proceeds on their sales in later years. In view of the record before us, we hold that the Indiana payments directed to the home renovation business are recoverable only upon resale of the renovated properties rather than as a loss for 2017. *See Wasco Real Props. I, LLC v. Commissioner*, T.C. Memo. 2016-224, at *23, *aff'd*, 744 F. App'x 534 (9th Cir. 2018); Treas. Reg. § 1.263A-1(c)(3) and (4).

As to the demolition/excavation business, it was not subject to the rules of section 263A, since Freedom First did not own the property that it improved. However, we first note that some of the Indiana payments that Mr. Weston contributed to that business were contributed and spent in 2016, not 2017. Second, at least some of those payments were used to buy an excavator and thus may not be immediately deducted absent an affirmative election under section 179(c) (which provides for immediate expensing of certain business property), of which there is no evidence here. *See* Treas. Reg. § 1.263(a)-1(d)(1). As well, the record does not indicate the excavator's purchase price.

Thus, even assuming (for the sake of argument) that the Westons have shown by a preponderance of the evidence that the demolition/excavation business had an operating loss in 2017, they have not proved any particular loss amount. Although at times we may estimate a taxpayer's business losses when the evidence does not establish a specific value, *see Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930), "we must have some basis on which an estimate may be made," *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985). Here, we have no grounds on which to estimate either the demolition/excavation business' gross receipts or the amounts of the Indiana payments that were spent for capital assets or other nondeductible purposes. The record does not even disclose how many jobs the business began or completed in 2017, let alone its contract

[*13] prices, except for a single instance: the $11,800 payment for the Medaryville job in 2018 that incurred $16,850 in expenses.

The Westons have not shown that they are entitled to claim any loss for 2017 under section 165(a) and (c)(1) on account of an operating loss incurred by either the home renovation business or the demolition/excavation business.

C.      *Whether the Westons May Deduct the Indiana Payments as Theft Losses*

The Westons alternatively contend that the Indiana payments are deductible for their 2017 tax year as a theft loss under section 165(a) and (c)(3). Section 165(c)(3) generally allows a deduction for "losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft." Section 165(e) provides that "[f]or purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." Treasury Regulation § 1.165-8(a)(2) clarifies that "a theft loss is not deductible under section 165(a) for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss."

Treasury Regulation § 1.165-1(d)(3) provides, in relevant part:

[I]f in the year of discovery [of a theft loss] there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

The Westons have challenged Treasury Regulation § 1.165-1(d)(3) as invalid. However, our Court has previously evaluated whether Congress intended section 165 to "allow[] taxpayers deductions [for theft losses] despite very arguable rights of recovery against third parties in the year the thefts are discovered." *Ramsay Scarlett & Co. v. Commissioner*, 61 T.C. 795, 810–11 (1974), *aff'd*, 521 F.2d 786 (4th Cir. 1975). We declined to allow such a deduction and instead found Treasury Regulation § 1.165-1(d)(3) to be a valid interpretation of the statute. *Ramsay Scarlett & Co.*, 61 T.C. at 811. We take the opportunity

**[\*14]** here to reiterate that on the basis of a thorough analysis of caselaw (including Supreme Court precedent) more fully set forth in *Ramsay Scarlett & Co.*, 61 T.C. at 810–11, Treasury Regulation § 1.165-1(d)(3) is the best interpretation of section 165(e).[6] Thus, a theft loss deduction is not allowed if there is a reasonable prospect of recovery, and "[a] reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor." *Ramsay Scarlett & Co.*, 61 T.C. at 811.

Further, our caselaw is clear that determining whether a theft loss has been sustained for tax purposes depends on the law of the jurisdiction where the taxpayer's alleged loss occurred. *Monteleone v. Commissioner*, 34 T.C. 688, 692 (1960); *see also Crowell v. Commissioner*, T.C. Memo. 1986-314, 51 T.C.M. (CCH) 1556, 1558. As relevant here, Ind. Code § 35-43-4-2(a) (2017) provides that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft." Although a criminal conviction is not a necessary element of a taxpayer's proof that he sustained a theft loss, *Monteleone*, 34 T.C. at 694, the taxpayer's failure to even attempt to instigate criminal charges may count against his proof, *Price v. Commissioner*, T.C. Memo. 1971-323, 30 T.C.M. (CCH) 1405, 1411.

Mr. Weston asserts that Mr. Broughton stole at least some of the Indiana payments and that he discovered Mr. Broughton's ongoing theft sometime in the later months of 2017. Some facts support Mr. Weston's allegations of theft. First, Mr. Weston received no or minimal cash distributions from Mr. Broughton in connection with either the home renovation business or the demolition/excavation business. Second, Mr. Broughton titled the Tax Deed Properties in the name of "ADR Properties, LLC" rather than "ADR Homes, LLC." Third, in February

---

[6] As the Supreme Court recently articulated in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2266 (2024), overruling *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), "instead of declaring a particular party's reading [of a statute] 'permissible' . . . , courts [must] determine the best reading of the statute and resolve [any] ambiguity." However, the Supreme Court cautioned that by overruling *Chevron* it did not "call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite [the Supreme Court's] change in interpretive methodology." *Loper Bright Enters.*, 144 S. Ct. at 2273. *Ramsay Scarlett & Co.* is such a case wherein the agency's interpretive action was lawful and entitled to stare decisis.

[*15] 2017 Ms. Stamm saw in person two of the Tax Deed Properties for whose renovation Mr. Weston had sent money, yet she did not see any external signs of renovation. Fourth, there is some evidence that Mr. Broughton cashed a check for Freedom First and kept the proceeds for himself. However, these facts are merely circumstantial evidence of theft.

On the flipside, the following facts speak against Mr. Weston's allegations that Mr. Broughton stole at least some portion of the Indiana payments in 2017 and that Mr. Weston discovered the theft in 2017: First, Mr. Weston continued paying invoices from Mr. Broughton through at least December 29, 2017, despite an earlier discovery of apparent failure to complete as least two home renovations as promised. Second, many of the Indiana payments were sent directly to third parties rather than to Mr. Broughton. Third, Mr. Weston made no attempt to instigate criminal charges against Mr. Broughton. *See id.* Fourth, Mr. Weston was rarely onsite in Indiana and did not personally see whether any of the properties were undergoing renovation, nor did he visit any of the demolition or excavation sites he funded during 2017. Finally, and most importantly, Mr. Weston continued to make payments on behalf of Freedom First well into 2018 (after purportedly discovering Mr. Broughton's theft in 2017), and he also purchased the Buckeye properties in January 2018 from Mr. Broughton at cost exceeding $700,000.

The record in these cases is much more consistent with incompetence or mismanagement on Mr. Broughton's part—and poor investment decisions on Mr. Weston's part—than with theft. The record does not support the Westons' contention that Mr. Broughton knowingly or intentionally exerted unauthorized control over property of Mr. Weston, with intent to deprive him of any part of its value or use, *see* Ind. Code § 35-43-4-2(a), the discovery of which occurred in 2017. On the contrary, Mr. Weston knowingly funded both the home renovation business and the demolition/excavation business at least through the end of 2017, and in some respects well into 2018.

Mr. Weston received title (through ADR Homes) to all of the Tax Deed Properties in 2018 and, although he lost 3 of them to tax foreclosure sales, he ultimately sold all but 11 of the remaining ones. He reported mostly losses but also some gains on the sales. In addition, Mr. Weston received title to real property from a customer of Freedom First (the Culver Academies) after 2017. Therefore, even assuming that Mr. Broughton stole some portion of the Indiana payments in 2017, the

**[\*16]** Westons have failed to show by a preponderance of the evidence that they had no reasonable prospect of recovery as of yearend 2017. *See Viehweg v. Commissioner*, 90 T.C. 1248, 1255–56 (1988).

We conclude that the Westons have not shown by a preponderance of the evidence that Mr. Broughton stole the Indiana payments, that the Westons discovered the theft in 2017, and that they had no reasonable prospect of recovery in 2017. Thus, the loss is not deductible under section 165(a) and (c)(3).

D. *Conclusion Regarding the Indiana Payments*

The Westons have not carried their burden of proving that some or all of the Indiana payments are deductible for 2017. Thus, they must treat any amounts Mr. Weston paid to Mr. Broughton as capitalized into his investments in the home renovation business or the demolition/excavation business. There are simply no grounds for deducting the payments as losses for the 2017 tax year.

III. *Additions to Tax*

A. *Section 6651(a)(1) and (2)*

Section 6651(a)(1) imposes an addition to tax for the failure to file a return on or before the due date (including extensions), in an amount equal to 5% of the amount required to be shown as tax on the return for each month for which the return is delinquent, not to exceed 25% in the aggregate. Section 6651(a)(2) imposes an addition to tax for the failure to timely pay the amount shown as tax on a filed return, in an amount equal to 0.5% of the amount shown as tax on the return for each month or fraction thereof the failure continues, not to exceed 25% in the aggregate. If the Commissioner prepares an SFR on the taxpayer's behalf, the filing of the SFR does not preclude or mitigate the failure-to-timely-file addition, which is computed on the basis of the actual amount of tax finally determined (even if that exceeds the amount shown on the SFR). I.R.C. § 6651(g)(1). The failure-to-timely-pay addition is computed on the basis of the amount shown as due on the SFR. *Id.* para. (2).

The taxpayer is excused from either addition to tax if he can establish that his failure to timely file or pay, respectively, was "due to reasonable cause and not due to willful neglect." I.R.C. § 6651(a)(1) and (2). To demonstrate reasonable cause, a taxpayer must show that he exercised ordinary business care and prudence with respect to filing

**[*17]** and paying his taxes.  He must further show that he nevertheless was unable to file or pay on time or that timely payment would have posed an undue hardship.  *United States v. Boyle*, 469 U.S. 241, 246 (1985); Treas. Reg. § 301.6651-1(c)(1).

Section 7491(c) provides that the Commissioner has the burden of production with respect to an individual's liability for any penalty or addition to tax.  To meet this burden, the Commissioner must come forward with sufficient evidence indicating that it is appropriate to impose the penalty or addition.  *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001).  Here, the Commissioner argues that he has satisfied his burden of production for the failure-to-timely-file addition because the parties stipulated that neither of the Westons filed a 2017 income tax return by their extended deadline of October 15, 2018.  The Commissioner argues that he has satisfied his burden of production for the failure-to-timely-pay addition by producing the SFRs prepared for Mr. and Mrs. Weston and by virtue of the parties' stipulations that neither of the Westons has made any income tax payments for their 2017 tax year.

The Westons contend that the Commissioner has failed to carry his burden of production for the failure-to-timely-pay addition because (1) neither SFR includes Form 1040 or a transcript of account, yet (2) the certification page (Form 13496) of each SFR represents that the SFR consists of, among other things: "A copy of the form *(e.g. Form 1040, 1041, 1120 etc.)* which the IRS used to establish the taxpayer's account on its computer system or, alternatively, a transcript of account reflecting the entry of data used to establish the taxpayer's account on the IRS computer system."

To constitute an SFR, the document prepared by the IRS must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and it must purport to be a "return." *Rader v. Commissioner*, 143 T.C. 376, 382 (2014), *aff'd in part, appeal dismissed in part*, 616 F. App'x 391 (10th Cir. 2015).  The combination of Form 13496, Form 4549–A, and Form 886–A, as included in each SFR prepared for the Westons, suffices to constitute a valid SFR under section 6020(b).  *See Rader*, 143 T.C. at 382.  There is no requirement that an SFR include a Form 1040 executed on behalf of the taxpayer. *Id.*  Since the Commissioner has satisfied his burden of production for

**[\*18]** both additions to tax, the Westons have the burden of proving that the reasonable cause exception applies. *Higbee,* 116 T.C. at 446.[7]

Regarding their failure to timely file, the Westons contend that they were "trapped in a morass by Broughton's fraud, unable to obtain information to prepare a reasonably accurate return." Mr. Weston testified that in 2017 or 2018 he was "pleading" with Mr. Broughton: "I said, I need help. I need to submit something to the IRS. You've got to help me. . . . Please give me something. And [I got] nothing." However, the unavailability of information or records does not necessarily establish reasonable cause for failure to timely file a tax return. *Elec. & Neon, Inc. v. Commissioner*, 56 T.C. 1324, 1343 (1971), *aff'd*, 496 F.2d 876 (5th Cir. 1974) (unpublished table decision); *Chu v. Commissioner*, T.C. Memo. 2005-110, 89 T.C.M. (CCH) 1256, 1259. A taxpayer generally is required to file timely using the best information available and to later file an amended return if necessary. *Estate of Vriniotis v. Commissioner*, 79 T.C. 298, 311 (1982). We see no grounds here for mitigating this general rule, as the Westons could have timely reported their income, expenses, and deductions arising from all their affairs except the Indiana investments and then later filed an amended return (with a claim for refund) if new information about those investments became available. *See* Treas. Reg. § 301.6402-3(a)(2) (providing that individual taxpayers may file Form 1040X, Amended U.S. Individual Income Tax Return, to claim a refund for overpayment of income tax).

Regarding their failure to timely pay, the Westons contend that they "suffered enormous personal and financial reversals that unavoidably delayed the preparation of [their] 2017 return" and that justified their failure to timely pay. However, the Westons have not offered evidence that any such personal or financial reversals were so disruptive that ordinary business care and prudence would not have sufficed for filing their return on time. *See* Treas. Reg. § 301.6651-1(c)(1). Nor have they offered evidence that paying their tax on time would have been "more than an inconvenience" and would have occasioned "substantial financial loss, for example, loss due to the sale of property at a sacrifice price." Treas. Reg. § 1.6161-1(b); *see* Treas. Reg. § 301.6651-1(c)(1) (providing that "undue hardship," for purposes of the reasonable cause exception to the failure-to-timely-pay addition

---

[7] The Westons argue that section 7491(c) imposes the burden of proof on the Commissioner, who therefore must establish that the Westons' delinquent filing was due to willful neglect. This argument mischaracterizes section 7491(c), which imposes on the Commissioner only the burden of production. *See Higbee*, 116 T.C. at 446–47.

[*19] to tax, is defined as in Treasury Regulation § 1.6161-1(b)). For instance, the Westons have not represented that they were reasonably relying on income from the Indiana investments in order to pay their 2017 tax liability, nor that their other income and assets were insufficient.

We hold that the Westons have not carried their burden of proof to establish reasonable cause with respect to either the failure-to-timely-file or the failure-to-timely-pay addition to tax.

B.      *Section 6654*

Section 6654(a) imposes an addition to tax on an individual who underpays his estimated tax. This addition to tax is calculated with reference to four required installment payments of the taxpayer's estimated tax liability. I.R.C. § 6654(c) and (d). Each required installment is generally equal to 25% of the "required annual payment." I.R.C. § 6654(d). The required annual payment is equal to the lesser of (1) 90% of the tax shown on the return for the tax year at issue (or, if no return is filed, 90% of the tax for such year) or (2) if the individual filed a return for the immediately preceding tax year, 100% (or in certain circumstances 110%) of the tax shown on that return. I.R.C. § 6654(d)(1)(B) and (C); *see Wheeler v. Commissioner*, 127 T.C. 200, 210–11 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008). The due dates of the required installments for a calendar-year taxpayer are April 15, June 15, and September 15 of the calendar year in question and January 15 of the following year. I.R.C. § 6654(c)(2).

The Commissioner's burden of production under section 7491(c) requires him to produce, for each year for which the addition to tax is determined, evidence that the taxpayer had a required annual payment under section 6654(d). *See Wheeler*, 127 T.C. at 211–12. Thus, the Commissioner must establish that (1) the taxpayer had a nonzero liability for the year at issue and (2) the taxpayer either filed a return showing a nonzero liability for the immediately preceding year or did not file a return for that year by the due date for payment of taxes for the year at issue. *See id.*; *Harvey v. Commissioner*, T.C. Memo. 2023-95, at *6–7.

In view of our holding that no part of the Indiana payments is deductible for 2017, the parties' stipulations as to the other components of the Westons' 2017 income tax liability suffice to show that the Westons have a nonzero liability for 2017. Further, the Commissioner

**[*20]** has produced the IRS account transcript for the Westons' 2016 tax year, indicating that the Westons did not file a 2016 return until January 2020, well past the due date for payment of 2016 tax, which was April 18, 2017.[8] Therefore, the Commissioner has shown that the Westons had a required annual payment under section 6654(d) for 2017. Moreover, the parties stipulated that the Westons have not made any 2017 tax payments. The Commissioner has satisfied his burden of production.

Section 6654 does not include a general exception for reasonable cause or lack of willful neglect. *See Rader*, 143 T.C. at 390; *Shapiro v. Commissioner*, T.C. Memo. 2023-144, at *27–28; Treas. Reg. § 1.6654-1(a)(1) ("This addition to tax . . . is imposed whether or not there was reasonable cause for the underpayment."). Nonetheless, no addition to tax is imposed under section 6654(a) with respect to any underpayment "to the extent the Secretary [of the Treasury or his or her delegate] determines that by reason of casualty, disaster, or other unusual circumstances the imposition of such addition to tax would be against equity and good conscience." I.R.C. § 6654(e)(3)(A). The Westons summarily assert that imposing the section 6654 addition to tax against them would be against equity and good conscience. But they have offered no evidence that Mr. Weston's losses on his Indiana investments constituted "unusual circumstances" on par with a "casualty" or "disaster." *See Hughey v. United States*, 495 U.S. 411, 419 (1990) (applying "the principle of *ejusdem generis*—that a general statutory term should be understood in light of the specific terms that surround it"); *cf. Meyer v. Commissioner*, T.C. Memo. 2003-12, 85 T.C.M. (CCH) 760, 761, 763 (excusing the taxpayer from the section 6654 addition to tax when, during the years at issue, he suffered from HIV/AIDS, had a nervous breakdown, and had to take a leave of absence from his job). We uphold the Commissioner's determination to impose the section 6654 addition to tax.

We have considered all arguments made by the parties and, to the extent not addressed herein, we find them to be moot, irrelevant, or without merit.

---

[8] The transcript also indicates that the Commissioner prepared an SFR for the Westons' 2016 tax year in February 2018. While there is no evidence in the record regarding whether that SFR showed a nonzero liability, that is immaterial here because an SFR is not considered to be a return for purposes of section 6654(d)(1)(B). *See, e.g.*, *Kupersmit v. Commissioner*, T.C. Memo. 2016-202, at *34; *Duma v. Commissioner*, T.C. Memo. 2009-304, 98 T.C.M. (CCH) 661, 665 n.6.

**[\*21]** To reflect the foregoing,

*Decisions will be entered under Rule 155.*